UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREGORY CHRYSLER,

                              Petitioner,                    Case No. 07-CV-8474 (KMK)

        -v-                                                  <u>OPINION AND ORDER</u>

G. GUINEY, Acting Superintendent,
Five Points Correctional Facility,

                              Respondent.

<u>Appearances:</u>

Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Petitioner*

Andrew R. Kass, Esq.
Orange County Attorney
Goshen, NY
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

        Petitioner Gregory Chrysler, through counsel, filed the instant petition for the writ of

habeas corpus ("the Petition" or "Habeas Petition") pursuant to 28 U.S.C. § 2254, challenging

his July 2000 conviction.  The Court referred the case to the Honorable Magistrate Judge Lisa M.

Smith, pursuant to 28 U.S.C. § 636(b), who issued a Report and Recommendation ("R&R"),

concluding that the Petition should be dismissed as untimely.  (R&R 14 (Dkt. No. 43).)

Petitioner submitted timely objections, again through counsel.  (Petitioner's Objections to R&R

Denying Habeas Corpus Petition as Untimely Filed ("Obj.") (Dkt. No. 45).)  For the reasons

stated herein, the Court adopts the conclusion of the R&R that the Petition should be denied, although for different reasons.

## I.  Background

### A.  The Underlying Events

Petitioner was a marijuana dealer operating in and around the town of Newburgh, New York.  (*See* Resp't's Mem. at 2.)  In late August 1998, police arrested Petitioner for felony marijuana possession based, at least in part, on information provided by a confidential informant.[1]  (*See id.* at 8–9.)  Unknown to Petitioner at the time, the informant was Michael Ronsini ("Ronsini"), who sold marijuana as part of Petitioner's criminal enterprise and whom police had arrested a few weeks prior to Petitioner.  (*See id.* at 6–8.)

Upset by his arrest and knowing that someone had cooperated with the police, Petitioner sought to discover the identity of the informant, whom Petitioner sometimes referred to as the "rat."  (*See id.* at 9–11.)  Initially, Petitioner correctly suspected Ronsini.  (*See id.*)  However, after conversations with Ronsini and others, Petitioner at some point came to suspect Dominic Pendino ("Pendino"), another of Petitioner's associates.  (*See id.* at 10–12.)

On the morning of March 3, 1999, Pendino went missing.  At approximately 5:47 a.m., Pendino's wife, Cynthia, saw him leave for work.  (*See id.* at 17.)  But shortly after 6:00 a.m., and then again approximately one hour later, Cynthia received phone calls from Pendino's employer asking where he was.  (*See id.* at 18.)  Cynthia ultimately went outside and found Pendino's car in the driveway, the keys still in the ignition.  (*See id.*)  Alarmed, she immediately called the police.  (*See id.*)  The responding officers conducted a search of the premises, whereby

---

[1] Petitioner ultimately pled guilty on April 28, 1999.  (*See* Resp't's Ex. 34 at 481 n.1.) He was thereafter sentenced on September 1, 1999, to one-to-four years in state prison.  (*See id.*)

they observed droplets of blood in the driveway and other areas.  (*See id.* at 19.)  The officers

then declared the area to be a crime scene and called for additional assistance from the

Newburgh Police Department and the New York State Major Crimes Unit.  (*See id.*)

After a thorough investigation of the scene, police investigators found a number of pieces

of evidence indicating that Pendino had possibly been murdered.  First, they found a fresh trail

of blood droplets leading from Pendino's driveway to a large pool of blood in the backyard, and

then a heavier trail of blood leading from that location to the driveway belonging to the house

next door.  (*See id.* at 20.)  Second, they found Pendino's blood-stained pager near the driveway.

(*See id.* at 20–21.)  Third, they found a pair of eyeglasses, which they later traced to Petitioner.

(*See id.* at 20, 24.)  Also, later that afternoon, after police told Ronsini about Pendino's

disappearance, Ronsini provided tape recordings of conversations between him and Petitioner

wherein Petitioner expressed his strong desire to seek revenge against the "rat."  (*See id.* at

10–11, 22.)

During their investigation into Pendino's disappearance, police investigators came to

suspect Petitioner and one of his associates, Larry Weygant ("Weygant").  Based on evidence

collected during their investigation, police obtained and executed a search warrant authorizing

them to seize two vehicles connected to Petitioner, among other items.  (*See id.* at 23–24.)

Forensic testing initially revealed the presence of blood in both vehicles, (*see id.* at 26–27), and

subsequent DNA testing confirmed the blood to be Pendino's, (*see id.* at 37–38).  Additionally,

police investigators approached Weygant's girlfriend, Salvatriece Ferretti ("Ferretti"), and

established a relationship whereby Ferretti spoke to police and gave them information on both

suspects "virtually everyday" during their investigation.  (*See id.* at 27–28.)

3

In early May 1999, police arrested Petitioner and Weygant.  (*See id.* at 36.)  A grand jury subsequently returned an Indictment against Petitioner and Weygant on June 7, charging them with two counts of murder in the second degree, one count of conspiracy in the second degree for conspiring to murder Pendino, and one count of conspiracy in the fifth degree for conspiring to possess marijuana.  (*See* Resp't's Ex. 1 (First Indictment).)  But for reasons that are not relevant to the Petition, the prosecution convened a second grand jury to consider the charges.  (Resp't's Ex. 15 at 184–85.)  Weygant, but not Petitioner, chose to testify during these proceedings.  (Resp't's Mem. at 38–43.)  Ultimately, the Grand Jury returned a superseding indictment on October 22, 1999, charging the same four counts.[2]  (*See* Resp't's Ex. 13 (Second Indictment).)  To this day, Pendino's body has never been found.  (*See* Pet. ¶ 40.)

B. Pre-trial Proceedings

During pre-trial proceedings, it was discovered that the police department responsible for investigating the crime, the Newburgh Police Department ("the Department"), had been using a system that recorded all of the Department's incoming and outgoing telephone calls, at all times relevant to the investigation.  (Resp't's Mem. at 47; Resp't's Exs. 18 (Order To Show Cause), 19 (Aff. in Supp. of Order To Show Cause).)  The prosecutor requested a protective order in relation to the taped conversations, arguing that it would impose a tremendous burden on the Department to isolate and record all of the phone calls relevant to the investigation of Petitioner and Weygant.  (Resp't's Exs. 18, 19.)

The trial court (Berry, J.), held a hearing on the issue, and credited testimony that to ascertain the existence of all recorded conversations going back more than a year and to retrieve

_____

[2] Justice Berry later dismissed one of the second-degree-murder counts.  (Tr. 3167, 3187.)

4

and record those conversations would take two detectives working full time one to three years or would require a substantial monetary investment in new equipment, which equipment would not be available for forty-five to sixty days.  (*See* Resp't's Mem. at 47–54; Resp't's Ex. 24 (Decision and Order granting requested protective order).)  The trial court also found that Department officers had credibly testified that they had not been previously aware that the tape recordings might yield discovery material, and that the District Attorney's Office had not been previously aware that the Department regularly recorded its phone calls.  (*See* Resp't's Mem. at 53; Resp't's Ex. 24.)  In a written decision, the trial court ruled that the Department was required to produce recordings of phone conversations between March 3, 1999, the date of the incident, and May 3, 1999, the date of the arrests, but was not required to find or produce relevant recordings outside that window.  (R&R 3; *see also* Resp't's Ex. 24.)

Also before trial, Petitioner moved to sever his trial from Weygant's.  (*See* Resp't's Ex. 30 at 341 (Hr'g Tr.).)  At a hearing, however, Petitioner withdrew his severance motion after allocution with the court, during which Justice Berry expressly stated that he would have granted Petitioner's severance request if it had not been withdrawn.  (*See id.* at 341, 345–48, 377–79.)  Justice Berry also discussed with Petitioner several items of evidence that would be admissible against Weygant but would be otherwise inadmissible against Petitioner; but, according to Petitioner, Justice Berry did not expressly state that the prosecutor would introduce Weygant's statements to the second Grand Jury against Petitioner, or that counsel would not have the opportunity to cross-examine Weygant as to the substance of those statements.  (Pet. ¶¶ 28–30; *see also* Resp't's Ex. 30 at 345–48, 377–79 (Hr'g Tr.).)

C.  The Trial

At the joint trial, the prosecution introduced two forms of evidence relevant to the instant Petition.  First, it called to the stand Ferretti, who testified about conversations between her and Weygant, many of which were inculpatory as to Petitioner.  (*See, e.g.*, Tr. 2128–29 (recounting a conversation with Weygant wherein Weygant suggested that he and Petitioner had been digging a ditch); *id.* at 2131–32 (recounting Weygant's statement to her that the police had searched Petitioner's house because Petitioner was an "official suspect" in the murder investigation); *id.* at 2150–52 (recounting a conversation between Weygant and Petitioner wherein each made statements indicating an intent to avoid detection and destroy evidence); *id.* at 2155–56 (recounting a conversation with Weygant where Weygant described how Petitioner intended to explain to police the presence of his eyeglasses at the scene of the crime); *id.* at  2160–61 (recounting Weygant's statements expressing frustration that he "just killed a kid for [Petitioner]"); *id.* at 2173 (recounting Weygant's confession wherein he described Petitioner's participation in the murder).)  Second, it admitted into evidence and read into the record Weygant's testimony to the second Grand Jury, wherein Weygant made many statements inculpatory as to Petitioner.  (*See, e.g.*, *id.* at 1794–96 (discussing Petitioner's prior charge and guilty plea for felony marijuana possession); *id.* at 1797–99 (recounting Petitioner's multiple statements to Weygant indicating Petitioner's belief that he was charged with the felony because "somebody [had] ratted him out"); *id.* at 1801–02 (commenting on a tape recording of a telephone call between Petitioner and Ronsini wherein Petitioner threatened Ronsini because he believed him to be the "rat"); *id.* at 1804–05 (describing Petitioner's involvement in digging a ditch); *id.* at 1805–06 (testifying that Petitioner believed, at certain times, that the victim was the

person who "ratted" him out); *id.* at 1809 (recounting certain details regarding Petitioner's eyeglasses).)

In its summation, the prosecution relied heavily on both Ferretti's trial testimony and Weygant's grand-jury testimony as substantive evidence of Petitioner's guilt. First, it used Petitioner's eyeglasses, which were found at the scene of the crime, to connect Petitioner to the murder, and in doing so specifically referred to Weygant's grand-jury testimony to establish that Petitioner and Weygant "were concerned about those glasses." (*Id.* at 3356–57 (noting that in his grand-jury testimony, "[Weygant] indicates going down to the optical store . . . and speaking to [the purveyor] with [Petitioner] about those eyeglasses"); *id.* at 3383 ("[Y]ou know from the forensic experts . . . [that] there were at least two people there that day. You know one of them, based on the eyeglasses, is [Petitioner]."); *id.* at 3438 ("You know from the defense pathologist . . . [that] two people were at the scene. [Petitioner], you know from the glasses[,] and somebody else."); *id.* at 3441 ("When you go to do some dirty work, you use your old clothes. If you are doing yard work, you're going to kill somebody, you don't wear your brand new glasses. You wear your older glasses, common sense."); *id.* at 3445–46 ("When you read the grand jury transcript, you'll see a lot of self-serving denials. . . . [Weygant] says the thing about the glasses. He gives a couple different versions. The last version he talks about the eyeglasses and, also, look in the grand jury minutes. He admits there when he says one of the statements to Ferretti that [Petitioner's] going to say. [Weygant] tells [Ferretti that Petitioner] is going to say that [the victim] found the glasses and was returning them. . . . [H]e knows that he's implicated in it and that his partner, [Petitioner], is implicated in it.").)

Second, the prosecution used Weygant's grand-jury testimony to show that Petitioner had previously been charged with felony marijuana possession, which charge, it argued, was the

basis for Petitioner's motive to kill Pendino, whom Petitioner believed had "ratted him out." (*See id.* at  3401 ("Weygant admits discussing [the identity of the rat] with [Petitioner] on numerous occasions.  You'll see . . . in [Weygant's grand-jury testimony] the facts of the marijuana case that [Petitioner] and his wife had been charged with.").)

Third, the prosecution used Weygant's grand-jury testimony to corroborate testimony that Petitioner helped dig a ditch in which he and Weygant allegedly disposed of the body.  (*See id.* at 3428–29 ("[Y]ou can read in the grand jury minutes, [Weygant] says that [Petitioner] didn't help on the . . . trench.  He says he showed up. . . .  Did [Petitioner] bring any tools to that? . . . [S]hortly before the homicide [Petitioner] borrowed a spade . . . .  There is only one thing you can do with a spade and that's dig a ditch."); *id.* at 3430 ("Weygant's conversations, himself, corroborate what [Ferretti] stated about the ditch.").)

Finally, the prosecution multiple times used Weygant's grand-jury testimony and Ferretti's testimony as general substantive proof that Weygant and Petitioner conspired to and actually did kill Pendino.  (*See id.* at 3339–40 (referencing testimony "concerning [Petitioner] and [Weygant] discussing concerns over their fingernails and the destruction of certain clothing items" and arguing that "[c]ommon sense dictates that you would only make those statements if you, in fact, committed murder"); *id.* at 3361 (arguing that "Weygant indicated to [Ferretti] . . . that he slept over at [Petitioner's] house the night of [the murder] . . . . [and] [a]dmitted to her . . . [that they] went to [the victim's] house[, they] wacked him[, they] hit him with a baseball bat[, and they] killed him," and arguing that "[t]hose statements are corroborated by [Weygant], himself, in [the grand-jury testimony] in evidence"); *id.* at 3381 (reminding the jury that "Ferretti told you . . . [that Weygant] stated he slept over at [Petitioner's] house[, then t]hey went over [and] picked up somebody in the city . . . . [and] transfer[red] the body to the [car]," and

asserting that "[t]here is further corroboration [for this account] in the grand jury minutes as to why [Weygant] would do this," namely that "he was friends with [Petitioner] for about ten years"); *id.* at 3383 ("[Y]ou know from [Weygant's] own words that this was part of a conspiracy. [Petitioner] and [Weygant] were speaking about who the informant was a lot. They were having constant conversations about that. The fact that they were having those constant conversations about who the informant was and about the marijuana arrest corroborates [Ferretti's] testimony that [Weygant] was [Petitioner's] partner or at least co-conspirator in the marijuana business."); *id.* at 3415 ("[Y]ou know [Petitioner] discussed all of this with [Weygant] by [Weygant's] own admissions. They were trying to figure out who the informant was, who bought marijuana, because [Petitioner] was selling the marijuana out of his house on that day and they were going through the list of people that were there. [Weygant] was there. The fact that [Weygant] is there at [Petitioner's] house certainly corroborates [Ferretti's] testimony that he was involved in the marijuana business."); *id.* at 3420, 3423 (telling the jury that "[y]ou also know that it was a planned conspiracy to commit murder," and "[y]ou know this in part from [Ferretti's] testimony," and "the corroboration from what [Ferretti] told you comes from [Weygant's grand-jury testimony]"); *id.* at 3444 ("[Weygant] tells [Ferretti] there I was at [Petitioner's] house the night before we went over and picked up my friend in the city. We went to [the victim's] house. We killed him with a baseball bat, transferred the body to [a car] and I buried him and I'm the only one who knows where he is."); *id.* at 3450 (characterizing Ferretti's testimony as indicating that "[s]he thought [Weygant and Petitioner] were not capable of this and she learned otherwise and you [the jury] learned otherwise, that they are guilty").)

Petitioner's trial counsel objected twice to the use of Weygant's grand-jury testimony during the summation. First, after the prosecutor read a section of the transcript to suggest that

Weygant drove Petitioner's car the day after the murder, trial counsel objected and claimed that "the jury ha[d] been misled" because the prosecutor neglected to read another part of the transcript undermining that interpretation.  (*See id.* at 3362–63.)  The trial court subsequently struck the prosecutor's reading of the transcript from the record and instructed the jury that they should draw their own inferences or conclusions from the evidence even where the prosecutor suggests particular inferences or conclusions.  (*See id.* at 3369.)  Second, trial counsel raised a similar objection to the prosecutor's suggested inference that Weygant's grand-jury testimony proved that Weygant "knew or believed incorrectly that the informant was [the victim]," even though other parts of the testimony suggested that Weygant was not so sure.  (*Id.* at 3384.)  Trial counsel specifically asked the trial court to instruct the jury to re-read the transcript during deliberations, (*see id.* at 3387–88), and to instruct the jury that the prosecutor's statements were only an "interpretation" of the transcript that should merely "guide[]" them during deliberations, (*see id.* at 3389).  After an adjournment, where trial counsel was "able to reflect on [the objection]," trial counsel then expanded the scope of his objection:

> MR. OSTRER:  [T]here is an issue that requires some remediation by the Court and that is [that the grand-jury testimony is] unlike any of the other testimony in the case . . . .
>
> THE COURT: It is not subject to cross examination.
>
> MR. OSTRER: Not only that, your Honor, but [the prosecutor] was the only one present and when he places it in the first person [*sic*].  I've asked this question of [Weygant] at the grand jury.  The jurors know that [the prosecutor] was present at the grand jury.  He's the only real witness other than [Weygant] to those proceedings.  It does carry a little bit additional weight when [the prosecutor] mischaracterizes or omits further questions from that testimony.  I do believe a curative instruction is required to avoid any sense among the jurors that [the prosecutor] would become effectively an unsworn witness by saying I asked this question.  This is what I perceive the answer to be.  I think that is implied when [the prosecutor] characterizes grand jury testimony.  Our petit jurors weren't there.  We weren't there.  [Petitioner] wasn't there and there is no cross examination of

[Weygant] in that respect.  I think we need to tread very carefully on areas where [the prosecutor] reads out of context certain questions or fails to read that ensuing question.  As your Honor recognized, there is a clear alternate interpretation to what [the prosecutor] attributed to the grand jury testimony.  We already have that on the record.  I think the court has recognized that and I think that needs to be conveyed to the jury.

THE COURT: Do you have a selected curative instruction you'd like me to give?

MR. OSTRER: I would like something on the order that [the prosecutor's] recollection of what the grand jury testimony is, is not binding on them.  If they have a question, they should refer to the actual transcript.

(*Id.* at 3390–92.)  After a further discussion over the proposed instruction, the trial court agreed to instruct the jury to draw their own inferences and conclusions based on the evidence, (*see id.* at 3393–94, 3396), and it did so instruct them, (*see id.* at 3399–400).

The jury convicted Petitioner of one count of Murder in the Second Degree, under N.Y. Penal Law § 125.25(1), one count of Conspiracy in the Second Degree, under N.Y. Penal Law § 105.15, and one count of Conspiracy in the Fifth Degree, under N.Y. Penal Law § 105.05(1). (R&R 1.)  On September 13, 2000, Justice Berry sentenced Petitioner to concurrent indeterminate terms of twenty-five years to life on the first count, eight-and-one-third to twenty-five years on the second count, and one year on the third count.  (*Id.*; *see also* Pet. ¶¶ 2–3.)

D. Direct Appeal and Collateral Attack

Petitioner filed a notice of appeal, but before the appeal was deemed fully perfected, initial appellate counsel ("Habeas Counsel"), who later returned as habeas counsel, was suspended from legal practice.[3]  (*See* Pet'r's Reply Mem. at 1 n.1.)  Subsequent appellate counsel was appointed, but Petitioner then replaced them with Mssrs. Isseks and Smith ("Direct

---

[3] Michael H. Sussman, Esq., initially represented Petitioner on direct appeal and, as will be explained below, resumed representation of Petitioner in his Petition for the Writ of Error Coram Nobis (Coram Nobis Petition) and in the instant Petition.

Appellate Counsel"), whom the Appellate Division approved to perfect the appeal on February 19, 2004.  (Pet. ¶ 7.)  Direct Appellate Counsel adopted the appellate brief that Habeas Counsel had previously prepared, in which they asserted claims based on alleged prosecutorial misconduct, discovery violations, the trial court's rulings on certain cross-examination issues and a circumstantial-evidence charge, and ineffectiveness of trial counsel.  (R&R 4.)  On December 29, 2004, the Appellate Division affirmed Petitioner's conviction, finding that the trial court had properly issued a protective order regarding the taped telephone conversations, and that Petitioner's remaining claims were without merit.  *See People v. Chrysler*, 787 N.Y.S.2d 365 (App. Div. 2004).  Petitioner then sought leave to appeal to the Court of Appeals, which request was denied on February 18, 2005.  *See People v. Chrysler*, 828 N.E.2d 88 (N.Y. 2005).

On May 2, 2005, Direct Appellate Counsel filed a motion to vacate Petitioner's conviction pursuant to New York Criminal Procedure Law § 440.10 ("the § 440.10 Motion"), on the grounds that trial counsel had been constitutionally ineffective by declining to advise Petitioner to accept the trial court's offer to sever Petitioner's trial from that of Weygant.  (Pet. ¶ 14; *see also* Resp't's Ex. 42 (§ 440.10 Motion).)  In the § 440.10 Motion, Direct Appellate Counsel also claimed that the admission and use of Weygant's statements to the Grand Jury violated Petitioner's Confrontation Clause rights, as enunciated in the Supreme Court's intervening decision in *Crawford v. Washington*, 541 U.S. 36 (2004).  Direct Appellate Counsel had not raised this Confrontation Clause argument in their direct-appellate brief or in their application for leave to the Court of Appeals.  (Pet. ¶ 15.)  Justice Berry denied the § 440.10 Motion on September 30, 2005, finding that, inter alia, Petitioner had made an intelligent and voluntary waiver of his Confrontation Clause rights, and that Petitioner should have raised his Confrontation Clause argument on direct appeal.  (*Id.* ¶ 17; *see also* Resp't's Ex. 45 (Decision

12

and Order denying § 440.10 Motion).)  Appellate counsel sought leave to appeal the denial to the Appellate Division, which denied the request on November 30, 2005.  (R&R 4.)

Approximately one year later, after resuming representation, Habeas Counsel filed a Coram Nobis Petition on Petitioner's behalf, arguing that by failing to raise the Confrontation Clause issue on direct appeal, Direct Appellate Counsel had provided constitutionally deficient representation.  (*Id.*)  Habeas Counsel signed and mailed the Coram Nobis Petition on October 16, 2006, and the District Attorney's Office apparently received the Coram Nobis Petition on October 18, 2006, but the Clerk of the Appellate Division did not file the Coram Nobis Petition until October 27, 2006.  (R&R 4–5; *see also* Obj. unnumbered 1–2.)  The Appellate Division denied the Coram Nobis Petition on February 6, 2007.  *See People v. Chrysler*, 827 N.Y.S.2d 879 (App. Div. 2007).  Habeas Counsel then sought leave to appeal to the Court of Appeals, which request was denied on June 15, 2007.  *See People v. Chrysler*, 872 N.E.2d 881 (N.Y. 2007).  Petitioner claims that the Court of Appeals' denial of leave was served on July 20, 2007. (Pet. ¶ 26.)

Habeas Counsel sent the instant Petition on July 27, 2007, via overnight delivery, to the District Court for the Western District of New York.  (*See* Sussman Aff. ¶ 5 (Dkt. No. 41); *id.* Exs. 2, 3.)  The Clerk then stamped and filed the Petition on August 8, 2007.  (*See* Pet.)  On August 21, 2007, District Judge David Larimer ordered the case transferred from the Western District of New York to the Southern District of New York.  (*See id.*)  The Court then referred the Petition to Magistrate Judge Smith, who recommends that the Petition be dismissed as untimely.

## II.  Discussion

### A.  Standard of Review

#### 1.  Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *see also Donahue v. Global Home Loans & Fin., Inc.*, No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007).  Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2)(C)–(F), *see* Fed. R. Civ. P. 6(d), for a total of seventeen days, *see* Fed. R. Civ. P. 6(a).

Where a party submits timely objections to a report and recommendation, as Petitioner has done here, the district court reviews de novo the parts of the report and recommendation to which the party objected.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Donahue*, 2007 WL 831816, at *1.  The district court "may adopt those portions of the . . . report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."  *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 72(b)(2)).

14

### 2.  Review of a Petition for Habeas Corpus

To receive the writ of habeas corpus from a federal district court, a petitioner must comply with the strict requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

First, AEDPA establishes an "exhaustion" requirement:  To be entitled to habeas relief, a petitioner must have exhausted his or her federal constitutional claims in state court.  *See* 28 U.S.C. § 2254(b)(1)(A); *see also Sepulveda v. New York*, No. 08-CV-5284, 2013 WL 1248379, at *2 (S.D.N.Y. Mar. 26, 2013) ("[U]nexhausted claims generally may not be considered on habeas review."); *Rosas v. Artus*, No. 05-CV-8440, 2013 WL 499610, at *4–5 (S.D.N.Y. Jan. 29, 2013) (discussing AEDPA's exhaustion requirement).  To satisfy the exhaustion requirement, a petitioner must have fairly presented the constitutional dimensions of his or her claims to the state courts.  *See Chellel v. Miller*, No. 04-CV-1285, 2008 WL 3930556, at *4 (E.D.N.Y. Aug. 21, 2008) ("A petitioner must present the substance of a habeas corpus claim to the state court, including its federal constitutional dimension, before a federal habeas court can consider it.").  *See generally Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982) (enumerating "the ways in which a state defendant may fairly present to the state courts the constitutional nature of [a] claim").  This requires a petitioner to have presented to the state court "all of the essential factual allegations" and "essentially the same legal doctrine" asserted in the federal habeas petition.  *Daye*, 696 F.2d at 191–92.  Moreover, the petitioner must have either appealed his or her conviction to the highest state court, or utilized available state methods for collaterally attacking the conviction and appealed any denial of the collateral attack to the highest state court.  *See Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005) (explaining that each claim for habeas relief must have been presented to the highest state court to be exhausted); *Haddock v.*

*Second Appellate Court*, No. 10-CV-3442, 2013 WL 3640150, at *4 (S.D.N.Y. July 15, 2013)

("A habeas petitioner satisfies the exhaustion requirement if he [or she] has presented his [or her]

claims for post-conviction relief to the highest state court.").

Second, AEDPA establishes a strict limitations period for habeas claims, according to

which a petitioner has one year to file a petition.  *See* 28 U.S.C. § 2244(d)(1).  This limitations

period begins to run from the latest of the following events:

> (A) the date on which the judgment became final by the conclusion of direct review
> or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action
> in violation of the Constitution or laws of the United States is removed, if the
> applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the
> Supreme Court, if the right has been newly recognized by the Supreme Court and
> made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could
> have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Pursuant to 28 U.S.C. § 2244(d)(1)(A), a judgment becomes final "only

after the denial of certiorari or the expiration of time for seeking certiorari," *Williams v. Artuz*,

237 F.3d 147, 151 (2d Cir. 2001)—in the latter case, ninety days after a decision by the New

York Court of Appeals, *see Walker v. Graham*, 955 F. Supp. 2d 92, 104 (E.D.N.Y. 2013)

(explaining that under AEDPA, "the one-year period [does] not begin to run until 90 days after

the Court of Appeals denie[s] [a petitioner's] direct appeal" (emphasis removed)).  During the

course of the one-year limitations period, if a petitioner files a collateral attack or seeks post-

conviction review, the statute of limitations is tolled during the time that claim is "pending."  *See*

28 U.S.C. § 2244(d)(2); *see also Diaz v. Bellnier*, No. 08-CV-4009, 2012 WL 4447357, at *5

(E.D.N.Y. Sept. 24, 2012) (explaining that "a properly filed" collateral attack on a judgment tolls

the limitations period, but does not cause "the one-year grace period to run anew").

  The limitations period may be equitably tolled, as well, if the petitioner can show that he

or she was prevented from filing an application in a timely fashion due to "extraordinary

circumstances," and that he or she acted with reasonable diligence during that time period.  *See*

*McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (explaining that "a [habeas] petitioner is

entitled to equitable tolling only if he [or she] shows (1) that he [or she] has been pursuing his

[or her] rights diligently, and (2) that some extraordinary circumstance stood in his [or her] way

and prevented timely filing" (first alteration in original) (quoting *Holland v. Florida*, 130 S. Ct.

2549, 2562 (2010))).  A petitioner separately may seek "an equitable *exception* to [AEDPA's

limitations period], not an extension of the time statutorily prescribed," by making a "credible

showing of actual innocence."  *Id.* at 1931–35 (emphasis in original).

  Third, the "independent and adequate state ground doctrine" precludes "a federal court

sitting in habeas" from reviewing "a question of federal law decided by a state court if the

decision of that court rests on a state law ground that is *independent* of the federal question and

*adequate* to support the judgment."  *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007)

(emphasis in original) (internal quotation marks omitted) (quoting *Coleman v. Thompson*, 501

U.S. 722, 729 (1991)); *see also Downs v. Lape*, 657 F.3d 97, 101 (2d Cir. 2011) ("We therefore

will not review questions of federal law presented in a habeas petition when the state court's

decision rests upon a state-law ground that is independent of the federal question and adequate to

support the judgment." (internal quotation marks omitted)).  "Independent and adequate state

law grounds preventing federal review include violations of state procedural rules—for example,

the failure to comply with a state's filing deadline." *Richardson*, 497 F.3d at 217 (citation

omitted). "An independent and adequate state ground for rejecting a federal claim does not bar

federal court review of the claim if the petitioner demonstrates 'cause and actual prejudice' for

failing to comply with the state rule." *Downs*, 657 F.3d at 101 n.1. Additionally, in an

"extraordinary case," a court may review a procedurally defaulted claim in order to avoid a

"fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (noting that this

exception is "explicitly tied" to the petitioner's innocence); *Doe v. Menefee*, 391 F.3d 147, 161

(2d Cir. 2004) (explaining that in "extremely rare" cases, "a petitioner may use his claim of

actual innocence as a 'gateway,' or a means of excusing his procedural default, that enables him

to obtain review of his constitutional challenges to his conviction").

> Finally, AEDPA establishes the relevant standard of review for habeas petitions:
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim . . . resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States.

28 U.S.C. § 2254(d)(1). Thus, a habeas petitioner is entitled to habeas corpus relief only if he or

she can show that "the state court 'unreasonably' applied law as established by the Supreme

Court in ruling on [P]etitioner's claim, or made a decision that was 'contrary to' it." *Cousin v.

Bennett*, 511 F.3d 334, 337 (2d Cir. 2008) (quoting 28 U.S.C. § 2254(d)(1)). "While 'the precise

method for distinguishing objectively unreasonable decisions from merely erroneous ones' is

somewhat unclear, 'it is well-established in [the Second] Circuit that the "objectively

unreasonable" standard of § 2254(d)(1) means that petitioner must identify some increment of

incorrectness beyond error in order to obtain habeas relief.'" *Sorto v. Herbert*, 497 F.3d 163,

169 (2d Cir. 2007) (brackets omitted) (quoting *Torres v. Berbary*, 340 F.3d 63, 69 (2d Cir. 2003)).  Moreover, a state court's determination of factual issues is presumed correct, and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006).

    B.  Analysis

        1. Timeliness

            a.  AEDPA's One-Year Limitations Period

    As noted, Magistrate Judge Smith recommended that the Petition be dismissed as untimely.  Pursuant to § 2244(d)(1), "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus."  28 U.S.C. § 2244(d)(1).  This period "shall run from . . . the date on which the [state court] judgment [resulting in conviction] became final by the conclusion of direct review or the expiration of the time for seeking such review."  *Id.* at § 2244(d)(1)(A).[4]  However, under § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted toward any period of limitation under this subsection."  *Id.* at § 2244(d)(2).  Thus, to determine whether the Petition was timely filed, the Court must calculate the number of days that passed in the limitations period, while being careful to exclude any days that should not be counted against the period pursuant to § 2244(d)(2).  *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) ("We therefore hold that proper calculation of Section 2244(d)(2)'s tolling provision excludes time during which

---

    [4] Under § 2244(d)(1), the limitations period actually begins running "from the latest of" four possible dates.  28 U.S.C. §§ 2244(d)(1)(A)–(D).  However, only the date of final judgment, referenced in § 2244(d)(1)(A), is relevant to this Petition.

properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run.").

### i.  The Relevant Dates

There are four operative events that determine whether the Petition was timely filed: (1) the Appellate Division's denial of leave to appeal the trial court's denial of Petitioner's § 440.10 Motion; (2) the filing of Petitioner's Coram Nobis Petition; (3) the Court of Appeals' denial of leave to appeal the Appellate Divisions' denial of the Coram Nobis Petition; and (4) the filing of the Habeas Petition itself.  Of these four events, the dates assigned to the first and third are not in dispute, as it is clear that the Appellate Division denied leave to appeal Petitioner's § 440.10 Motion on November 30, 2005, (*see* R&R 4), and that the Court of Appeals denied Petitioner's leave to appeal the denial of his Coram Nobis Petition on June 15, 2007, *see People v. Chrysler*, 872 N.E.2d 881 (N.Y. 2007).

But the Parties do dispute the dates assigned to the second and fourth events—i.e., the filing dates of the Coram Nobis Petition and the Habeas Petition.  For each petition, Respondent argues that the filing date should be the date that the petition was deemed "filed" by the state and federal court, respectively.  (*See* Resp't's Mem. at 57–59.)  This would result in a filing date of October 27, 2006, for the Coram Nobis Petition and a filing date of August 8, 2007, for the Habeas Petition.  *Id.*  In response, Petitioner argues that the filing date should be the date that the petition was *received* by the court.  (*See* Pet'r's Reply Mem. at 9–10; Obj. at unnumbered 1–3.) In the absence of conclusive evidence of the dates on which the courts actually received the petitions, Petitioner asks the Court to deem the Coram Nobis Petition filed on October 18, 2006

20

(the day Respondent admits it received a copy of the petition), and to deem the Habeas Petition filed on July 30, 2007 (the day the Petition presumably arrived after Petitioner sent it via overnight mail on Friday, July 27, 2007).[5]  *Id.*

Petitioner is correct in that, under both federal and New York law, the filing date for a document submitted by litigants with the assistance of counsel—including prisoners—is the date on which the document is received by the clerk of the court.  *See Noble v. Kelly*, 89 F. Supp. 2d 443, 450 (S.D.N.Y. 2000) ("As a general rule, a petition for habeas corpus is deemed filed for statute of limitations purposes when it is received by the clerk of the district court."), *aff'd*, 246 F.3d 93 (2d Cir. 2001); *Grant v. Senkowski*, 744 N.E.2d 132, 133 (N.Y. 2001) ("The term 'filing' is statutorily defined as 'the delivery of the . . . notice of petition . . . to the clerk of the court . . . .'" (quoting N.Y. C.P.L.R. § 304) (first alteration in original)).  With regard to the Coram Nobis Petition, New York courts "recognize that a presumption exists that the actual filing date is the date [the materials] are stamped filed by the County Clerk."  *Resch v. Briggs*, 856 N.Y.S.2d 317, 319 (App. Div. 2008).  "However, extraordinary circumstances may exist establishing that the actual filing of these documents occurred on an earlier date than that reflected on the stamp and, if clear and unequivocal evidence exists establishing that fact, it will serve to rebut the presumption."  *Id.*

Here, Petitioner succeeds in rebutting the presumption.  First, the Court notes that the Petition was dated "October 16, 2006," (*see* Pet.), and Habeas Counsel avers, in a sworn

---

[5] Neither Party has submitted a copy of the Coram Nobis Petition that indicates its actual date of receipt by the state court.  (*See* Resp't's Ex. 47 (copy of Coram Nobis Petition containing no stamps or markings indicating date of receipt).)  Moreover, although the Habeas Petition contains a filing-date stamp, it has no markings indicating a date of receipt.  (*See* Pet. (containing a "FILED" stamp indicating a filing date of August 8, 2007).)

Affirmation, that "[his] office mailed, postage pre-paid, the Coram Nobis Petition" to the state court on that same date, (*see* Sussman Aff. ¶ 2).  Second, Habeas Counsel claims, again under oath, that in "more than 15 years of experience with like mailings from Orange County, it is highly unusual that such mail would not arrive at the [Second Department] Courthouse in Brooklyn by the second day following mailing," and that he "cannot think of a single instance where that has occurred." (*Id.* ¶ 3.)  Finally, Petitioner claims, and Respondent agrees, that Respondent received a copy of the Coram Nobis Petition on October 18, 2006, two days after it was mailed on the same day as the officially filed Petition. (*See id.* ¶ 2; Resp't's Mem. at 57). These facts lead the Court to conclude that the Coram Nobis Petition was received by the state court before the presumptive date of October 27, 2006. *Cf. Da'Ville v. Wise*, 470 F.2d 1364, 1365 (5th Cir. 1973) (refusing to consider an appeal to be time barred where "a strong possibility exist[ed]" that the notice was received before the stamped filing date).

Having rebutted the presumption, Petitioner asks the Court to deem the Coram Nobis Petition filed on October 18, 2006, the day on which Respondent received its copy of the Petition. (*See* Obj. at unnumbered 2; Pet'r's Reply Mem. at 10.)  The Court, however, feels that October 19, 2006, would be a more appropriate date.  First, Petitioner admits that he "reasonably expected [that the Coram Nobis Petition] would be received within two, or, at the most, three days." (Obj. at unnumbered 1.)  Second, where the actual date of receipt is unknown, "[t]here is a presumption in [the Second Circuit] that a mailed document is received three days after its mailing when the person who mailed the document followed regular office practice and procedure or has actual knowledge of having mailed the document." *Isaacson v. N.Y. Organ Donor Network*, 405 F. App'x 552, 553 (2d Cir. 2011) (citations omitted); *see also Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525–26 (2d Cir. 1996) ("Normally it is assumed that a

mailed document is received three days after its mailing.").  Although courts frequently apply

this presumption, derived from Federal Rule of Civil Procedure 6(d), in Title VII cases with

respect to a plaintiff's receipt of a right-to-sue letter, *see, e.g.*, *Castro v. United Sec. Inc.*, No. 10-

CV-6152, 2011 WL 4916402, at *2 (S.D.N.Y. Oct. 17, 2011), courts have also applied the

presumption in AEDPA cases, *see, e.g.*, *Wright v. Marshall*, No. 05-CV-2280, 2005 WL

1861633, at *2 (E.D.N.Y. Aug. 4, 2005) (concluding that a habeas petition "was timely filed"

after "applying the usual presumption that a mailed document is received three days after it is

sent" where the petition was filed on May 2, 2005, but the filing deadline was April 29, 2005).[6]

Given the three-day presumption and Petitioner's "reasonabl[e] expect[ation]" that the Coram

Nobis Petition would be filed "within . . . three days," (*see* Obj. at unnumbered 1), the Court

holds that the Coram Nobis Petition was filed on October 19, 2006, three days after it was

mailed.

With regard to the Habeas Petition, there is also a presumption that such a petition was

received by the federal court on the day it was stamped "filed."  *See In re Piper Aircraft*

*Distribution Sys. Antitrust Litig.*, 551 F.2d 213, 216 n.7 (8th Cir. 1977) ("[I]t is open to an

appellant to prove that [a notice of appeal was received] on a date earlier than that recorded on

---

[6] The Court notes that, in other contexts, courts have refused to apply the three-day
presumption in AEDPA cases.  For example, the Fourth and Fifth Circuits do not apply the
presumption to limitations-period calculations pursuant to § 2244(d)(1)(A), reasoning that the
date of final judgment, rather than the date of notice of the final judgment, initiates the running
of the limitations-period clock.  *See Rouse v. Lee*, 339 F.3d 238, 245–46 (4th Cir. 2003); *Cruther
v. Cockrell*, 301 F.3d 656, 657 (5th Cir. 2002).  However, application of the three-day
presumption to § 2244(d)(1)(A), where the limitations-period clock is explicitly triggered by a
"judgment," is distinct from the situation here, where the filing date depends on receipt of a
mailed petition.  In any event, the Second Circuit has not yet addressed this issue.  *See Zarvela v.
Artuz*, 254 F.3d 374, 383 n.6 (2d Cir. 2001) (declining to consider the district court's "decision
to extend the one-year limitations period by three days because [petitioner] was notified by mail
of the state court's denial of his collateral challenge").

the notice of appeal."). Here, the record supports Petitioner's objection that the Clerk received the Petition on July 30, 2007—over a week before the Clerk stamped it "filed" on August 7, 2007. First, Habeas Counsel has stated, in a sworn Affirmation, that he sent the Petition to the Clerk of the District Court for the Western District of New York by "overnight mail" on July 27. (*See* Sussman Aff. ¶ 5.) Second, Habeas Counsel has also submitted what he avers is a copy of a letter, dated July 27, 2007, and captioned "overnight mail," which he sent to the Clerk of the Western District along with the Habeas Petition, and a DHL Receipt, which indicates that counsel sent the Petition to the Clerk on July 27, 2007, for "Next Day" delivery. (*Id.* Exs. 2, 3.) Third, in his Affirmation, Habeas Counsel describes that he sent, along with the Petition, an application for admission to the bar of the Western District of New York; that shortly thereafter, the Western District Clerk informed him that the Petition would be filed "directly"; and that on August 1, he was sent additional forms regarding his admission to the Western District, which he filled out and subsequently submitted. (*Id.* ¶¶ 6–7.) Respondent maintains that the Petition was filed on August 7, 2007, (*see* Resp't's Mem. at 58 & n.21), but does not dispute Petitioner's factual allegations.

"Under general New York law . . . , the Second Circuit has indicated that mailing a letter creates a presumption that the addressee received it." *Bronia, Inc. v. Ho*, 873 F. Supp. 854, 859 (S.D.N.Y. 1995) (citing *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985)). Where a party submits sworn statements and evidence indicating that a mailing was sent via overnight delivery, and where the opposing party fails adequately to rebut this evidence, courts may find that the mailing was delivered the day after it was sent. *See S.E.C. v. Batterman*, No. 00-CV-4835, 2002 WL 31190171, at *5–6 (S.D.N.Y. Sept. 30, 2002) (finding that an overnight mailing was delivered the next day where defendant disputed receipt but plaintiff offered a sworn

24

declaration and Federal Express records confirming the mailing and delivery dates).  Moreover, the Western District, where the Habeas Petition was originally filed, applies a one-day presumption, similar to the three-day presumption for regular mail, to mail sent via overnight delivery.  *See* W.D.N.Y. R. 5.1(g) ("Where a period of time . . . is measured from the service of a paper and service is by overnight delivery, one business day shall be added to the prescribed period.").

Particularly persuasive here are Habeas Counsel's statements indicating that he included with the habeas petition "an application for admission to the WDNY," and that, "[b]y letter dated August 1, 2007, [he] was sent some additional materials to file [sic] out before [his] application for admission could be acted upon."  (Sussman Aff. ¶¶ 6–7.)  Not only does this support Petitioner's argument that the Petition was received before August 7—indeed, for the Clerk to respond on August 1, the Petition must have been received on or before that day—it also places this case in the line of cases where a party attempted to file a court document on time but was thwarted by ministerial or procedural obstacles unattributed to the filing party that delayed the time between receipt and filing.  *See, e.g.*, *Parissi v. Telechron, Inc.*, 349 U.S. 46, 46–47 (1955) (per curiam) (reversing dismissal of appeal as untimely where the clerk received but refused to file a notice of appeal until petitioner paid the filing fee).  As the Second Circuit recognized in *Contino v. United States*, 535 F.3d 124 (2d Cir. 2008) (per curiam),

> [Federal Rule of Civil Procedure] 5(d)(4) . . . states, 'The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice.' Moreover, Rule 83(a)(2) prohibits the enforcement of a local rule regulating the form of a filing if its enforcement would cause a party to lose a right and the party's non-compliance with the rule was not willful.

*Id.* at 127 (quoting Fed. R. Civ. P. 5(d)(4)) (citing Fed. R. Civ. P. 83(a)(2)).  In that case, the court ultimately held that the appeal was timely because, where the appellant "attempted to file

[a notice of appeal electronically] within the required time-frame," but the notice was "rejected by the clerk for failure to comply with a local rule" requiring paper submissions, the appellant "should not lose his right to appeal because of an error in the form of the notice of appeal." *Id.* at 126–27. Here, Habeas Counsel, who had not been admitted to practice in the Western District, was apparently attempting to comply with Local Rule 83.2, which specifies that "[a]n attorney who is not a Member of the bar of this Court may appear in an action only if he or she applies to become *pro hac vice* counsel." W.D.N.Y. R. 83.2(a)(1).

Thus, in line with *Contino*, and in light of Habeas Counsel's sworn affirmations, the Court finds that the Petition was received by the Clerk before the filing date of August 7, 2007. Furthermore, in light of record evidence indicating that the Petition was sent via overnight mail on July 27, and in consideration of the one-day presumption for overnight mail recognized by courts and the Western District's Local Rules, the Court holds that the Petition was received, and thus was filed for statute-of-limitations purposes, on July 30, 2007.[7]

### ii. The Limitations-Period Calculation

As discussed above, habeas petitions are subject to a "1-year period of limitation," but "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted" toward that period. 28 U.S.C. §§ 2244(d)(1)–(2). Because Petitioner's judgment became final in 2005, but Petitioner did not file the Petition until 2007, the outcome of the timeliness issue hinges on how much time is excluded from the limitations-period calculation pursuant to § 2244(d)(2). And, as will become clear, because the

---

[7] To be clear, the filing date is July 30, and not July 28, because the Petition was sent on a Friday, and Habeas Counsel sent it via *regular* overnight mail—i.e., he did not request Saturday delivery. And even if he had sent it for Saturday delivery, the Clerk would not have received it until the Court reopened the following Monday.

26

timeliness issue in this case is so close, it is necessary to determine whether three of the four dates discussed above—namely, the two final-judgment dates and the date Petitioner filed his Coram Nobis Petition—count toward the limitations period.

With regard to filing dates, the Supreme Court and the Second Circuit both appear to consider the date on which a post-trial collateral challenge is filed to be excluded from the limitations period. *See Artuz v. Bennett*, 531 U.S. 4, 9 (2000) ("If . . . an application is erroneously *accepted* by the clerk of a court . . . it will be *pending*, but not *properly filed*" (first emphasis added)); *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd sub nom. Artuz v. Bennett*, 531 U.S. 4 (2000) (holding that an application is "'pending' from the time it is *first filed*" (emphasis added)); *see also Fernandez v. Artuz*, 402 F.3d 111, 116 (2d Cir. 2005) ("[T]he term 'properly filed' [in § 2244(d)(2)] fixes the date that *starts the tolling* of the AEDPA statute of limitations . . . ." (emphasis added)); *accord Nichols v. Brown*, No. 09-CV-6825, 2012 WL 555043, at *2 (S.D.N.Y. Feb. 21, 2012) ("[T]he limitations period was tolled on November 5, 2007, when petition[er] filed his coram nobis petition."); *Wilkins v. Kirkpatrick*, No. 06-CV-2151, 2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009) ("AEDPA's one year statute of limitations is tolled from the date a petitioner files his or her 440.10 motion . . . ."); *Collins v. Artus*, 496 F. Supp. 2d 305, 312 (S.D.N.Y. 2007) ("[T]he statute of limitations is tolled from the date the motion is filed . . . .").

Moreover, the Second Circuit appears not to exclude from the limitations period the date on which a state court files a final judgment resolving the pending motion or petition.  As the Second Circuit has explained, because "[w]e held in *Geraci* [*v. Senkowski*, 211 F.3d 6 (2d Cir. 2000),] that statutory tolling for the purposes of AEDPA ends with the 'filing' of the state court's final order . . . . a motion ceases to be 'pending' for the purposes of AEDPA *on the date*

27

*of filing*." *Saunders v. Senkowski*, 587 F.3d 543, 549 (2d Cir. 2009) (emphasis added); *see also Fernandez*, 402 F.3d at 116 ("[T]he term 'pending' marks the end point [of the tolling], when the state court ultimately decides the . . . case."). This language appears to instruct courts not to exclude the day the final order was filed from the limitations period, because the state court review is not "'pending' . . . on the date of filing." *Saunders*, 587 F.3d at 549. And, in fact, this appears to be the implied practice of the Second Circuit. *See, e.g.*, *Pratt v. Greiner*, 306 F.3d 1190, 1195 (2d Cir. 2002) (calculating a tolling period of ninety-five days from March 19, 1998, to June 22, 1998, and a period of 188 days from August 27, 1998, to March 3, 1999, necessarily excluding from the tolling period the date state-court review concluded); *Hizbullahankhamon v. Walker*, 255 F.3d 65, 69 (2d Cir. 2001) (calculating a tolling period of 205 days from January 28, 1997 (first coram-nobis-petition filing date), to August 21, 1997 (first coram-nobis-petition final-judgment date), and a tolling period of 246 days from June 17, 1998 (second coram-nobis-petition filing date), to February 18, 1999 (second coram-nobis-petition final-judgment date)).

But a review of other higher court cases calls into question both of these propositions. For example, in *Lawrence v. Florida*, 549 U.S. 327 (2007), the Supreme Court counted the day on which the petitioner filed an application for state post-conviction relief against the limitations period when it noted that "[a]ll but one day of the limitations period had lapsed during the 364 days between the time [petitioner's] conviction became final [on January 20, 1998] and when he filed for state postconviction relief [on January 19, 1999]." *Id.* at 330. Similarly, in *Smith v. McGinnis*, 208 F.3d 13 (2d Cir. 2000), the court counted the day petitioner filed his coram nobis petition against the limitations period when it noted that the period "ran for 364 days, [from April 24, 1996,] until [April 23, 1997, when petitioner] filed the coram nobis petition." *Id.* at

16.[8]  And the court implicitly counted the filing day against the limitations period twice in

*Bethea v. Girdich*, 293 F.3d 577 (2d Cir. 2002) (per curiam), where it held that "[272] days

elapsed between the date [petitioner's] conviction became final (April 9, 1999) and the date

[petitioner] moved to file a late notice of appeal (January 6, 2000)," and that "[e]ighteen . . . days

[of the limitations period] elapsed . . . between the denial of that motion (on March 13, 2000),

and the filing of [petitioner's] motion for reargument (on March 30, 2000)." *Id.* at 579.[9]

By contrast, in other cases, the Second Circuit has implicitly excluded the final-judgment

day from the limitations period.  In *Geraci v. Senkowski*, 211 F.3d 6 (2d Cir. 2000), *superseded

by statute on other grounds, as stated in Dillon v. Conway*, 642 F.3d 358 (2d Cir. 2011) (per

curiam), the Second Circuit twice endorsed the district court's tolling-period calculation, which

explicitly held that "the dates on which the relevant decisions with respect to the post-conviction

motions are rendered" are not "counted towards the statute of limitations."  *Geraci v. Senkowski,*

---

[8] However, the *Smith* court also appeared to count the filing day as "tolled" when it
excluded from the limitations period "the approximately 208-day period during which the coram
nobis petition was pending."  *Smith*, 208 F.3d at 16.  Per the opinion, the tolling ran from the
filing day (April 23, 1997) until final-judgment day (November 17, 1997), when "the
[limitations] period resumed running."  *Id.*  The calculation resulting in a 208-day period must
have counted either the filing day or the final-judgment day as tolled.  Thus, either the court
counted the filing day as both included and excluded, or it tolled the final-judgment day—both
practices that are in apparent conflict with other Second Circuit opinions.

[9] In both cases, it is possible that the court counted the dates the convictions became final
against the limitations period, instead of the dates petitioners filed their notices of appeal.
However, this would conflict with Second Circuit precedent instructing courts to apply Federal
Rule of Civil Procedure 6(a) to the limitations-period calculation under § 2244(d)(1).  *See
Mickens v. United States*, 148 F.3d 145, 148 (2d Cir. 1998).  Under Rule 6(a), "[w]hen the
[statutory time] period is stated in days or a longer unit of time," the court must "exclude the day
of the event that triggers the period."  Fed. R. Civ. P. 6(a)(1)(A).  Thus, under Second Circuit
precedent, when a conviction becomes final pursuant to § 2244(d)(1)(A), "the one-year statute of
limitations for filing a habeas petition [begins] to run" on the "following day."  *Collins v. Ercole*,
667 F.3d 247, 249 (2d Cir. 2012).

23 F. Supp. 2d 246, 253 (E.D.N.Y. 1998), *aff'd*, 211 F.3d 6 (2d Cir. 2000).  First, the court noted

that the limitations-period clock "began to run again on August 26, 1997, when Geraci was

denied leave to appeal the Appellate Division's denial of his section 440.20 motion."  *Geraci*,

211 F.3d at 9.  In the context of the district court's opinion, this language is somewhat confusing,

because August 26 was "the day *after* the petitioner was denied leave to appeal," *Geraci*, 23 F.

Supp. at 253 (emphasis added), not, as the Second Circuit described it, the day "*when* [the

petitioner] was denied leave to appeal," *Geraci*, 211 F.3d at 9 (emphasis added).  Second, the

court noted that "[t]he *coram nobis* petition was denied on February 17, 1998 and the time clock

started to run again. . . . until February 24, 1998, the day the [habeas] petition was filed, a total of

seven days."  *Geraci*, 211 F.3d at 9.  This calculation of "seven days" indicates that the court

necessarily included either the date the coram nobis petition was denied or the date the habeas

petition was filed.  Upon consideration, it must have been the latter, because in determining

whether a habeas petition is timely filed, a court must include the petition filing date within the

limitations period.  *See Smith v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000) (holding that, where

the limitations period "[had run] for 364 days," petitioner "had one day remaining . . . in which

to file the . . . habeas petition").

 *Geraci*'s primary holding—that a coram nobis petition filed in New York state court

ceases to be pending when the Appellate Division denies it—has been expressly affirmed at least

twice, and in neither case did the court discuss the district court's decision to exclude the day the

order was filed from the limitations period.  *See Saunders*, 587 F.3d at 549 (rejecting petitioner's

arguments as "precluded by our holding in *Geraci* . . . . that statutory tolling for the purposes of

AEDPA ends with the 'filing' of the state court's final order"); *Hizbullahankhamon*, 255 F.3d at

71 (responding to the question of "when [petitioner's coram nobis] motions ceased to be

pending" by noting that "*Geraci* compels us to answer that" the motions "ceased to be pending" on the dates on which the Appellate Division denied them).  Furthermore, in *Dillon v. Conway*, 642 F.3d 358 (2d Cir. 2011) (per curiam), the Second Circuit discussed, without criticism, the *Geraci* district court's holding that the limitations-period clock began running the day after the state court review became final.  *See id.* at 360–61 (noting that the district court in *Geraci* held "that '[t]he [AEDPA] statute of limitations began running . . . the day *after* the petitioner was denied leave to appeal" (emphasis and alterations in original)).[10]

Taken together, these opinions provide the Court with somewhat conflicting guidance as to whether either the filing date or the final-judgment date or both count towards the limitations period.  And in the context of this case, the discussion is much more than academic—indeed, it is potentially outcome determinative—because, as discussed below, the Petition is timely only if the Court excludes both the Coram Nobis Petition filing day and both final-judgment days.

Petitioner's conviction became final on May 19, 2005, ninety days after the Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's denial of his direct appeal on February 18, 2005.  *See Valverde v. Stinson*, 224 F.3d 129, 132 (2d Cir. 2000) (holding that a conviction became final "when the ninety-day period to seek direct review from

---

[10] Interestingly, in *Dillon*, the court faulted a lawyer for "operat[ing] under an incorrect assumption that the AEDPA statute of limitations begins to run on the day *after* a petition is denied leave to appeal to the New York Court of Appeals."  642 F.3d at 360.  The court attributed the incorrect assumption to a "misinterpretation" of the district court's opinion in *Geraci*, which the court noted arose under "different circumstances"—presumably that, in *Geraci*, the district court decided to start the limitations-period clock when final judgment is entered, under § 2244(d)(2), whereas in *Dillon*, the court decided to start the clock at the conclusion of direct review, under § 2244(d)(1)(A).  *Id*. at 360–61 (emphasis removed).  This distinction is curious, however, in the context of *Collins v. Ercole*, 667 F.3d 247 (2d Cir. 2012), where the Second Circuit subsequently noted that, when the period for direct review of a petitioner's conviction ended, the one-year limitations period triggered by § 2244(d)(1)(A) "began to run . . . [t]he *following day*."  *Id*. at 249 (emphasis added).

the . . . Supreme Court by way of certiorari expired"). However, because Direct Appellate

Counsel filed Petitioner's § 440.10 Motion on May 2, 2005, the finalization of the conviction did

not start the limitations-period clock on May 19. *See Wilkins v. Kirkpatrick*, No. 06-CV-2151,

2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009) ("AEDPA's one year statute of limitations is

tolled from the date a petitioner files his or her 440.10 motion until the date the Appellate

Division denies the petitioner leave to appeal that decision."). Instead, the first relevant day for

calculating the limitations period is November 30, 2005, when the Appellate Division denied

leave to appeal the trial court's denial of Petitioner's § 440.10 Motion. *See Walker v. Graham*,

No. 10-CV-5558, 2013 WL 3338683, at *4 (E.D.N.Y. July 2, 2013) ("The 440 Motion ceased to

be 'pending' under [§ 2244(d)(2)] once the Appellate Division denied leave to appeal . . . .").

The first day that counted against the limitations period was thus either November 30, the day

the order was filed, or December 1, the day after.

　　The limitations-period clock then continued to run until October 19, 2006, when (as the

Court has determined) Petitioner filed his Coram Nobis Petition. *See Nichols v. Brown*, No. 09-

CV-6825, 2012 WL 555043, at *2 (S.D.N.Y. Feb. 21, 2012) ("[T]he limitations period was

tolled . . . when petition[er] filed his coram nobis petition."). The tolling period thus started on

either October 19, the filing date, or October 20, the day after. The clock remained stopped until

June 15, 2007, when the Court of Appeals denied Petitioner's request for leave to appeal the

Appellate Division's denial of the Coram Nobis Petition. *See Flowers v. Ercole*, No. 06-CV-

6118, 2009 WL 2986738, at *7 n.3 (S.D.N.Y. Sept. 18, 2009) (holding that a coram nobis

petition "remained pending until . . . the Court of Appeals denied [petitioner's] application for

leave to appeal the Appellate Division's denial of his [petition].").  The first day that counted in the resumed limitations period was thus either June 15, the day leave to appeal was denied, or June 16, the day after.[11]  Petitioner ultimately filed his Habeas Petition on July 30, 2007.

The span of time from November 30, 2005, to October 19, 2006, *inclusive* of both days, contains a total of 324 days.  This left on the limitations-period clock either 41 days (if neither day counted as tolled), 42 days (if one, but not the other, day counted as tolled), or 43 days (if both days counted as tolled).  Then, when the Coram Nobis Petition was finally denied on June 15, 2007, the clock began running again.  If June 15 did not count as tolled, the deadline for filing the Petition was either July 25, 2007 (41 days later, counting June 15 as the first day), July 25 (42 days later), or July 26 (43 days later).  However, if June 15 was tolled, the deadline for filing was either July 26 (41 days after June 15), July 27 (42 days after), or July 28 (43 days after).  And if the deadline was calculated to be July 28, 2007, the deadline would actually be July 30, 2007, because July 28 was a Saturday and, under Federal Rule of Civil Procedure 6(a)(1)(C), "if the last day [of a limitations period] is a Saturday . . . the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."  Fed. R. Civ. P. 6(a)(1)(C); *see also Mickens*, 148 F.3d at 148 (applying Rule 6 to AEDPA limitations-period

---

[11] In his Objections, Petitioner asserts that "he should be given at least until June 18, 2007 . . . before time was held against him."  (Obj. at unnumbered 2.)  However, the Second Circuit has been clear that it is the date the order was *filed*, not the date on which Petitioner received *notice* of the order, that is relevant for calculating the AEDPA limitations period.  *See Saunders*, 587 F.3d at 549 ("We [have] . . . expressly rejected [the] argument that [a] *coram nobis* petition remain[s] 'pending' until [a petitioner] receive[s] notice of the state court's order. . . . [A] motion ceases to be 'pending' for purposes of AEDPA on the date of filing [of the state court's final order] . . . .").

calculations).  Thus, under this calculation, the Petition was timely only if the Court excludes from the limitations period the Coram Nobis Petition filing date (October 19, 2006) and both final-judgment dates (November 30, 2005, and June 15, 2007).

In the context of the uneven treatment of this issue the Court has identified in Second Circuit case law on this topic, the Court finds that this Petition is timely.  First, excluding the date on which Petitioner filed his Coram Nobis Petition flows directly from the Second Circuit's holding that an application is "'pending' from the time it is *first filed*."  *Bennett*, 199 F.3d at 120 (emphasis added).  Because the application "is pending" on the day it is filed, that day "shall not be counted" toward the limitations period.  28 U.S.C. § 2244(d)(2).  Second, excluding the date on which a state court issues a final judgment resolving a post-conviction motion is in line both with Second Circuit precedent declaring the final-judgment day as the end of the tolling period, *see Saunders*, 587 F.3d at 549 ("[A] motion ceases to be 'pending' . . . on the date of filing."), and with Second Circuit precedent applying Federal Rule of Civil Procedure 6 to AEDPA limitations-period calculations, *see Mickens*, 148 F.3d at 148.  In this context, Rule 6 would operate to "exclude the day of the event that triggers the [limitations] period," such that the final-judgment day would not count against that period.  *See* Fed. R. Civ. P. 6(a)(1)(A).  Finally, the Court notes that this interpretation of § 2244(d) is consistent with other court decisions construing AEDPA's requirements broadly and applying them with some amount of leniency.  *See Windland v. Quarterman*, 578 F.3d 314, 317 & n.5 (5th Cir. 2009) (using a calculation method similar to the Court's while noting that "the AEDPA statute of limitations should not be applied too harshly" (internal quotation marks removed)).  Therefore, by the narrowest of margins, the Court concludes that the Petition is timely.

34

### b. Equitable Tolling

Although the Court has found that the Petition is timely, it will now proceed to discuss whether, in the alternative, the Petition is entitled to equitable tolling.[12]  In this context, Petitioner's § 440.10 Motion became final for AEDPA purposes on November 30, 2005, and Habeas Counsel filed the Coram Nobis Petition on October 27, 2006—331 days later.[13]

The Supreme Court has acknowledged that there may be circumstances justifying equitable tolling of the AEDPA limitations period.  *See Holland*, 130 S. Ct. at 2562, ("[W]e therefore join the Courts of Appeals in holding that § 2244(d) is subject to equitable tolling."); *see also McQuiggin*, 133 S. Ct. at 1931 (reaffirming that equitable tolling of AEDPA's limitations period is appropriate in certain circumstances).  For equitable tolling to be available, a petitioner must establish two elements: first, that some "'extraordinary circumstance stood in his way' and prevented timely filing," *Holland*, 130 S. Ct. at 2562; and, second, that "he [or she] has been pursuing his [or her] rights diligently," *id.*  In the alternative, a petitioner may claim an *exception* from AEDPA's limitations period by making out a convincing claim of innocence. *McQuiggin*, 133 S. Ct. at 1931–35.

_____

[12] Petitioner's Objection to the R&R did not address the issue of equitable tolling. However, subsequent correspondence from Petitioner invokes equitable principles relevant to such tolling, (Letter from Petitioner to Court (Apr. 20, 2010) (Dkt. No. 47)), and subsequent correspondence from Habeas Counsel expressly directs the Court to the Supreme Court's decision in *Holland v. Florida*, 130 S. Ct. 2549 (2010), in which the Court established the standards for equitable tolling in the habeas context, (Letter from Michael Sussman, Esq. to Court (June 21, 2010) (Dkt. No. 49)).  The Court will therefore address whether Petitioner is entitled to equitable tolling of AEDPA's limitations period.

[13] Because the equitable-tolling analysis is relevant only in the alternative that the Petition was not timely filed, the Court will accept, in this analysis alone, the filing dates and date-range calculations as used in the R&R.  (*See* R&R 10–11.)

"As a general matter, [the Second Circuit] set[s] a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." *Dillon*, 642 F.3d at 363.  For example, courts in the Second Circuit have consistently held that the failure to obtain transcripts or other relevant court documents does not constitute an extraordinary circumstance.  *See Morales v. Bradt*, No. 11-CV-329, 2013 WL 600176, at *4 (W.D.N.Y. Feb. 11, 2013) (collecting authority for the proposition that "lack of access to legal materials or papers does not constitute an extraordinary circumstance that warrants equitable tolling"); *Sookoo v. Heath*, No. 09-CV-9820, 2011 WL 6188729, at *4 (S.D.N.Y. Dec. 12, 2011) (explaining that "[c]ourts in this circuit have consistently held that routine difficulties in obtaining trial transcripts do not amount to 'extraordinary circumstances' that equitably toll AEDPA's statute of limitations" absent something further—for example, a corrections officer's deliberate efforts to withhold relevant documents from the petitioner); *Padilla v. United States*, No. 02-CV-1142, 2002 WL 31571733, at *4 (S.D.N.Y. Nov. 19, 2002) ("Even if [petitioner] did not have all the necessary materials or experienced a delay in obtaining them, those are not extraordinary circumstances warranting equitable tolling."); *Davis v. McCoy*, No. 00-CV-1681, 2000 WL 973752, at *2 (S.D.N.Y. July 14, 2000) ("[T]he inability to obtain documents does not rise to the level of extraordinary circumstances.").  Among the "limited circumstances" that merit equitable tolling, for example, is an attorney's "outrageous and incompetent" conduct that rises to a "truly extraordinary" level. *Doe*, 391 F.3d at 159; *see also Holland*, 130 S. Ct. at 2564 (explaining that an attorney's error must rise above "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline" to merit equitable tolling (citation and internal quotation marks omitted)).

36

Petitioner does not allege intentional misconduct on the part of any prison official.

Instead, Petitioner and Habeas Counsel argue that Direct Appellate Counsel engaged in

outrageous misconduct by failing to transfer Petitioner's transcripts and files ("the file") to

Habeas Counsel in a timely manner.  (*See* Letter from Petitioner to Court (Apr. 20, 2010) (Dkt.

No. 47).)[14]  This argument fails based on the evidence in the record.  According to

correspondence that Petitioner has submitted, Habeas Counsel first informed Direct Appellate

Counsel that Habeas Counsel would represent Petitioner going forward on December 8, 2005.

(*See id.*, Unnumbered Ex. (Letter from Michael H. Sussman, Esq., to Robert N. Isseks, Esq., &

Alex Smith, Esq. (Dec. 8, 2005)).)  But Habeas Counsel did not directly request that Direct

Appellate Counsel return the file until June 8, 2006.  (*See id.*, Unnumbered Ex. (Letter from

Michael. H. Sussman, Esq., to Petitioner (June 8, 2006)) (directing Petitioner to "advise Mr.

Isseks that he has been relieved as your counsel and that *he should return the* [*file*] *to me.  To*

*date, I have not received the same and cannot complete your project without* [*it*]" (emphasis

added)).)  And Direct Appellate Counsel transferred the file to Habeas Counsel by, at the latest,

---

[14] By way of recap:  Habeas Counsel was initially retained to serve as Petitioner's Direct Appellate Counsel, but he was suspended from practice as of July 15, 2002—after drafting but before filing Petitioner's direct appeal.  Petitioner was then briefly represented by substitute counsel, whom he replaced with Direct Appellate Counsel.  During the course of Direct Appellate Counsel's representation, the Supreme Court issued its opinion in *Crawford v. Washington*, 541 U.S. 36 (2004).  Direct Appellate Counsel then submitted the direct appellate brief that had already been prepared by Habeas Counsel, without including a *Crawford*-based Confrontation Clause argument in the appellate brief or in their supplemental brief.  After the denial of the direct appeal became final, substitute counsel filed the § 440.10 Motion, making the Confrontation Clause arguments, in May, 2005.  Habeas Counsel was reinstated just prior to the filling of the § 440.10 Motion.  The trial court denied that motion in November, 2005, concluding that, inter alia, Direct Appellate Counsel had failed to argue *Crawford* on direct appeal.  In early 2006, Petitioner requested that Habeas Counsel handle the Coram Nobis Petition, alleging ineffective assistance of Direct Appellate Counsel for failure to raise the Confrontation Clause argument on direct appeal.

August 30, 2006.  (*See id.*, Unnumbered Ex. (Letter from Michael. H. Sussman, Esq., to Petitioner (Aug. 30, 2006)) (explaining that Habeas Counsel "was able to retrieve your materials from prior counsel"; that "[t]he boxes were a mess"; and that Habeas Counsel had been "on trial for several weeks and could not devote needed attention to this project").)  While Direct Appellate Counsel's approximately three-month delay in transferring the file to Habeas Counsel may have been inconvenient, it was not outrageous.  There is no allegation that Direct Appellate Counsel deliberately or intentionally sought to deprive Habeas Counsel of the file, or that they otherwise were hostile to Habeas Counsel's overtures.  Moreover, Habeas Counsel even acknowledged that had Direct Appellate Counsel transferred the file earlier, Habeas Counsel would have been unable to work on the Coram Nobis Petition, because he was "on trial."  In short, Petitioner has failed to demonstrate that "extraordinary circumstances" merit equitable tolling.

But even if the Court were to determine that Direct Appellate Counsel's delay in turning over the files and transcripts could constitute an extraordinary circumstance, it would still be Petitioner's burden to show that he diligently pursued his rights, and that Direct Appellate Counsel's failure to turn over the transcripts was the cause of the untimely filing.  *See Nash v. McGinnis*, No. 04-CV-9496, 2005 WL 1719871, at *4 (S.D.N.Y. July 22, 2005) ("It is true that confiscation of legal papers may justify equitable tolling if it can be said to prevent the petitioner from filing his petition within the limitation period, and if he was otherwise diligent in attempting to procure the materials necessary to seek habeas relief.").  Petitioner has a colorable argument that he acted with diligence; but he has failed to make a showing of causation.

With respect to the diligence requirement, Petitioner has submitted seven letters sent between and among Petitioner, Direct Appellate Counsel, and Habeas Counsel, as evidence of

his and Habeas Counsel's efforts in pursuing Petitioner's habeas rights. (*See* Letter from Petitioner to the Court (Apr. 20, 2010), Unnumbered Exs. (correspondence among Petitioner, Habeas Counsel, and Direct Appellate Counsel).) In at least one of those letters, Petitioner expressly asked Habeas Counsel where he "stand[s] concerning the clock running" for habeas purposes. (*Id.*, Unnumbered Ex. (Letter from Petitioner to Michael H. Sussman, Esq. (Jan. 3, 2006)).) Petitioner further states that his family made several telephone requests for the files to be released from Direct Appellate Counsel. (*See id.*) And finally, Petitioner diligently pursued multiple state remedies—direct appeal, the § 440.10 Motion, and the Coram Nobis Petition—to challenge his conviction. His case is therefore distinguishable from those cases where a petitioner fails to make *any* showing of efforts undertaken to vindicate his or her rights. *Compare Dillon*, 642 F.3d at 360–62 (explaining that there was "no question that [petitioner] ha[d] been pursuing his rights diligently" where petitioner, among other things, "[w]hile incarcerated . . . had another inmate help him draft a *pro se* habeas petition"; retained counsel "to represent him in post-conviction collateral proceedings"; "*specifically asked* [*counsel*] *not to wait until the last day to file the petition*"; directed counsel to spend "considerable time tracking down a copy of a videotape that [petitioner] believed would be useful in preparing the petition and would exonerate him"; and where petitioner's wife "called [counsel] several times on behalf of [petitioner] to ask if he had filed the [p]etition and to report that [petitioner] was worried about running out of time" (emphasis in original) (internal quotation marks omitted)), *with Nash*, 2005 WL 1719871, at *4 (denying equitable tolling where "[p]etioner [made] no specific allegations explaining . . . what efforts he made to secure the transcript, or when and how he secured enough of the transcript to file the instant [p]etition").

39

On the other hand, the letters Petitioner has submitted suggest that Petitioner's and Habeas Counsel's efforts fall somewhere between sporadic and diligent. Of these letters, four are dated between December 8, 2005, and January 9, 2006, (*See* Letter from Petitioner to Court (Apr. 20, 2010), Unnumbered Exs.), and the next was not sent until June 8, 2006, (*see id.*, Unnumbered Exs.)—150 days later. Petitioner states that during this time he was unaware that his Coram Nobis Motion was not in progress or that Direct Appellate Counsel was apparently not in sync with Habeas Counsel's efforts to obtain the documents. (*See id.*) But Habeas Counsel presumably was aware of these difficulties. Moreover, after discussing that the files and transcripts had not been turned over as of June 13, 2006, Petitioner and Counsel still allowed another seventy-eight days to pass before the file was finally retrieved. (*See id.*, Unnumbered Ex. (Letter from Michael Sussman to Petitioner (Aug. 30, 2006)) (explaining that Habeas Counsel was "*finally* . . . able to retrieve [the] materials from prior counsel"; that "[t]he boxes were a mess"; and that Habeas Counsel was "on trial for several weeks and *could not devote needed attention* to this project" (emphases added)).) And after retrieving and reorganizing the materials, Habeas Counsel allowed another forty-seven days to elapse before he *sent* the Coram Nobis Petition on October 16, 2006—notwithstanding when it was actually stamped filed. *Cf. Lee v. Portuondo*, No. 02-CV-3990, 2003 WL 22173078, at *2 (E.D.N.Y. Aug. 29, 2003) (concluding that the petitioner's three attempts to obtain files in the one-year limitations period did not constitute a diligent effort); *Lewis v. Walsh*, No. 03-CV-1932, 2003 WL 21729840, at *3 (S.D.N.Y. July 25, 2003) (holding that petitioner's sending "sporadic" letters requesting documents, written "with lengthy delays between each letter," was not a sufficiently diligent effort).

40

But even assuming that Petitioner's and Habeas Counsel's efforts were diligent, Petitioner has fallen well short with respect to the causation requirement.  In neither his letter to the Court, (Letter from Michael Sussman, Esq., to Court (June 21, 2010) (Dkt. No. 49)), nor in Petitioner's Objections, (Obj.), does Habeas Counsel explain why he needed access to Petitioner's file to draft the Coram Nobis Petition.  To the contrary:  Habeas Counsel even admitted in his correspondence with Petitioner that he had been otherwise unable to work on Petitioner's Coram Nobis Petition due to his work on another trial, (*see* Letter from Petitioner to Court (Apr. 20, 2010), Unnumbered Ex. (Letter from Michael Sussman to Petitioner (Aug. 30, 2006)) (explaining that Habeas Counsel had been "on trial for several weeks and *could not devote needed attention* to this project" (emphasis added))).  *See Morales*, 2013 WL 600176, at *4 ("In any event, assuming *arguendo* that [p]etitioner's alleged lack of access to his legal papers for 'approximately 11 months' while they were purportedly in the possession of [counsel] constituted extraordinary circumstances, [p]etitioner has failed to demonstrate the causal connection between the lawyer's 'withholding' of [p]etitioner's legal papers until February 24, 2009 and [p]etitioner's delay in filing the habeas petition until some two years thereafter on April 11, 2011."); *Tamayo v. United States*, No. 05-CV-9001, 2008 WL 417674, at *4 (S.D.N.Y. Feb. 13, 2008) (denying equitable tolling where petitioner claimed that the jail had  "misplaced his legal papers," because, inter alia, petitioner failed to address "whether these papers were actually needed to prepare the [untimely] motion").  There is a single sentence in one of Habeas Counsel's letters to Petitioner that supports a causation claim: "To date, I have not received [your transcripts and files from Direct Appellate Counsel] and cannot complete your project without them."  (Letter from Petitioner to Court (Apr. 20, 2010), Unnumbered Ex. (Letter from Michael H. Sussman to Petitioner (June 8, 2006)).)  But at no point has Petitioner or Habeas

41

Counsel explained *why* the transcripts and files were necessary to the drafting of the Coram Nobis Petition.  Indeed, any such claim would be unpersuasive:  Habeas Counsel had already prepared Petitioner's direct appellate brief before being suspended from the practice of law, and the arguments he raised in the Coram Nobis Petition were limited to an ineffective-assistance-of-counsel claim, based on Direct Appellate Counsel's failure to raise a *Crawford*-based Confrontation Clause argument on appeal.  (Resp't's Ex. 47 (Coram Nobis Petition).)  Habeas Counsel could have filed such a motion even before gaining access to Petitioner's file.  *Cf. Morales*, 2013 WL 600176, at *4 (denying equitable tolling where "[p]etitioner [did] not explain how the allegedly-withheld legal papers were even necessary in the preparation of the instant petition insofar as the claims are nearly identical to those raised on direct appeal and in [p]etitioner's *pro se* coram nobis application"); *Tamayo*, 2008 WL 417674, at *4 n.35 (finding equitable tolling was unavailable where petitioner "could have filed a 'bare bones' petition within the limitations period and sought leave to amend thereafter").

Finally, Habeas Counsel had received and organized Petitioner's file by, at the latest, August 30, 2006. (Letter from Petitioner to Court (Apr. 20, 2010), Unnumbered Ex. (Letter from Michael Sussman to Petitioner (Aug. 30, 2006)).).  At that point, Petitioner still had over ninety days left in the one-year limitations period to file the instant Petition.[15]  Habeas Counsel opted to pursue the Coram Nobis Petition prior to filing the instant Petition, apparently to exhaust the ineffective-assistance-of-appellate-counsel argument he intended to make on behalf of Petitioner here.  (*See id.*, Unnumbered Ex. (Letter from Michael Sussman to Petitioner (Jan. 6, 2006))

---

[15] As noted, the first operative date for calculating the limitations period is November 30, 2005, the date on which the Appellate Division denied leave to appeal the trial court's denial of Petitioner's § 440.10 Motion.

(stating his "opinion[] [that] the best strategy is to file a *coram nobis* petition raising the issue of ineffective assistance of appellate counsel for failure to add the *Crawford* issue," and further counseling that it was not "prudent to expend [a] habeas corpus opportunity on an appeal of the [§] 440.10 where the reasons for not raising that matter on direct appeal seem unconvincing" (emphasis in original)).)  Under these circumstances, Habeas Counsel's failure to diligently monitor AEDPA's limitations period, does not constitute an extraordinary circumstance warranting equitable tolling.  *See Holland*, 130 S. Ct. at 2564 (explaining that counsel's error must rise above "a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline" to merit equitable tolling (citation and internal quotation marks omitted)); *Dillon*, 642 F.3d at 362 (same).

Equitable tolling is therefore unavailable to Petitioner in the event that the Petition is deemed untimely filed.[16]

---

[16] As noted, in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), the Supreme Court acknowledged an "equitable *exception*" to AEDPA's limitations period, separate from the equitable-tolling doctrine, according to which a court may review an untimely habeas petition where the petitioner makes a "convincing claim of actual innocence," *id.* at 1931, 1935.  Here, the Petition could be read to imply that Petitioner is actually innocent.  (Pet. ¶ 40 (stating that "Mr. Perdino['s] body has never been found," and that Petitioner has "denied any culpability for his murder").)  But this statement alone is not equivalent to a showing of "actual innocence by clear and convincing evidence" or even a "credible claim of actual innocence."  *See McQuiggin*, 133 S. Ct. at 1934–35.  The Court thus declines to consider Petitioner's untimely Petition on the basis of his actual innocence.

2. *Brady*/*Rosario* Claim

Petitioner asserts *Brady* and *Rosario* violations based on the prosecutor's failure to turn over the tape recordings of all of the recorded phone calls relevant to the investigation of the underlying crime.[17]

Respondent argues that this claim was not exhausted, because "although petitioner claimed more generally on direct appeal that the trial court's . . . issuance of the protective order[] violated his right to a fair trial . . . , he never fully presented or established his claim as a federal constitutional deprivation."  (Resp't's Mem. 92.)  This argument fails.  As noted, to preserve a claim for habeas relief, Petitioner must have presented "the substance of [the] habeas corpus claim to the state court, including its federal constitutional dimension."  *Chellel*, 2008 WL 3930556, at *4.  In the Second Circuit, one of "the ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim" is "reliance on pertinent

_____

[17] Petitioner's claim is based on the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), and the New York Court of Appeals' decision in *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961).  *Rosario* stands for the proposition that, as a matter of state law, "a criminal defendant is entitled to the prior statements of the prosecution's witnesses in order to determine if the testimony of such witnesses in court departs from their prior statements," *Ely v. Lempke*, No. 09-CV-5836, 2012 WL 7050432, at *16 n.8 (S.D.N.Y. Oct. 18, 2012), *adopted by* 2013 WL 544070 (S.D.N.Y. Feb. 11, 2013).  The rule announced in *Rosario* is now codified as a statutory rule.  *See* N.Y. Crim. Proc. Law § 240.45; *see also Ely*, 2012 WL 7050432, at *16 n.8; *People v. Williams*, 854 N.Y.S.2d 586, 589 (App. Div. 2008) ("The *Rosario* rule, codified in CPL 240.45, obligates the prosecution to disclose any recorded statement in its possession or control made by a person the prosecutor intends to call to the stand, which relates to the subject matter of the witness' testimony." (internal quotation marks omitted)).

It is well settled, however, that to the extent that Petitioner's claim relies on *Rosario*, he is asserting a state law claim which is not a cognizable claim for habeas relief.  *See Ely*, 2012 WL 7050432, at *16 ("[T]o the extent petitioner is asserting a *Rosario* violation he has alleged only a state law claim which is not even cognizable in a federal habeas corpus proceeding."); *see also Johnson v. New York*, No. 01-CV-4219, 2002 WL 1974048, at *2 (S.D.N.Y. Aug. 26, 2002) (same).  The Court will therefore evaluate Petitioner's claim, only to the extent it is based on the constitutional requirements set forth in *Brady*.

federal cases employing constitutional analysis." *Daye*, 696 F.2d at 194.  Indeed, in *Daye*, the Second Circuit held that petitioner's "citations of . . . two cases in the context of his factual assertions were sufficient to give the state courts notice that he asserted a constitutional claim." *Id.* at 196.  In the direct-appellate brief, Petitioner's first basis for setting aside the verdict was "Prosecutorial Misconduct," an argument in which Petitioner addressed the prosecutor's failure to turn over recorded conversations, which Petitioner described as "both *Rosario* and *Brady* materials."  (Resp't's Ex. 33 at 421, 425; *see also id.* at 442–447 (arguing that "The Trial Court Improperly Limited the People's Obligations under *Rosario* and *Brady*").)  Petitioner offered further support for these arguments in his supplemental brief.  (*See* Resp't's Ex. 38 at 653 (arguing that the trial court's order limiting the prosecutor's disclosure obligations under *Brady* "deprived [Petitioner] of his *federal and state constitutional rights to due process and a fair trial*" (emphasis added)).)  Thus, the Court concludes that the Appellate Division was sufficiently apprised of the federal constitutional dimension of Petitioner's nondisclosure argument.

"There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Parker v. Smith*, 858 F. Supp. 2d 229, 236–37 (N.D.N.Y. 2012) (same).  "A habeas petitioner must satisfy all three elements to prevail on a *Brady* claim." *Parker*, 858 F. Supp. 2d at 237; *see also Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (considering each element of habeas petitioner's *Brady* claim).  But Petitioner's *Brady* claim is not standard issue:  Rather than objecting to the suppression of particular evidence—which evidence was demonstrably favorable, and which

45

suppression was prejudicial—Petitioner argues that the trial court's protective order excused the prosecution from finding evidence that *could* have been favorable to the accused; that *discovery* of evidence, rather than evidence itself, was suppressed; and that prejudice *could* have ensued, due to the sheer number of recorded phone calls the Department received and made.  In other words, Petitioner's *Brady* claim is entirely speculative.  And as a general matter, *Brady* claims fail where the claimant fails specifically to identify the "potential undisclosed *Brady* materials" or "to set forth any specific facts indicating that such evidence was withheld.  Conclusory or speculative allegations that the Government failed to disclose evidence are insufficient to support a *Brady* violation."  *Verdel v. Cunningham*, No. 07-CV-0837, 2008 WL 2755833, at *4 (S.D.N.Y. July 14, 2008); *see also Visich v. Walsh*, No. 10-CV-4160, 2013 WL 3388953, at *16 (S.D.N.Y. July 3, 2013) ("Without more, [p]etitioner's unsupported assertion that the prosecution failed to disclose exculpatory or impeaching information at the time of trial . . . is insufficient to warrant *habeas* relief."); *Castillo v. United States*, No. 07-CV-2976, 2010 WL 3912788, at *6 (S.D.N.Y. Sept. 8, 2010) (holding that, where "[p]etitioner [did] not point to any specific evidence that was withheld," his "broad, conclusory claims . . . [were] insufficient to support his claim of a constitutional violation"); *Skinner v. Duncan*, No. 01-CV-6656, 2003 WL 21386032, at *25 (S.D.N.Y. June 17, 2003) (denying *Brady* claims as "merit[less]" where petitioner "provide[d] no evidence to support his allegations"), *adopted by* No. 01-CV-6566 (S.D.N.Y. May 7, 2004) (Dkt. No. 20).  Petitioner's *Brady* claim is consequently denied.[18]

---

[18] It bears remembering that the trial court did not excuse the prosecution from reviewing and/or disclosing all of the recordings.  Indeed, the prosecution was directed to disclose all recorded conversations that were identifiable from investigators' materials, and to retrieve all recorded conversations between March 3, 1999 (the day of the murder), and May 3, 1999 (the day of Petitioner's arrest).  (Resp't's Ex. 24.)  From this smaller universe of disclosures, Petitioner has not identified any exculpatory evidence or information.

Petitioner responds that, under the circumstances, it is "logically impossible" for Petitioner to satisfy these requirements. His position, in this respect, is superficially appealing. But the fact that Petitioner cannot shoehorn his nondisclosure argument into a *Brady* claim does not demonstrate that his claim is meritorious; it demonstrates that *Brady* was the wrong vehicle to advance his nondisclosure claim. What Petitioner actually objects to is not the suppression of evidence, but the Department's failure to identify the taped telephone calls earlier in the proceedings, the prosecutor's failure to disclose the existence of the calls, and the trial court's issuance of a protective order. Petitioner might have been better served arguing that these aspects of the criminal proceeding violated fundamental conceptions of justice and deprived him of Due Process. *See, e.g.*, *Williams v. Artus*, No. 11-CV-5541, 2013 WL 4761120, at *12 (E.D.N.Y. Sept. 4, 2013) ("The appropriate standard of review for a habeas corpus claim alleging prosecutorial misconduct is the narrow one of due process, and not the broad exercise of supervisory power. The petitioner must demonstrate that the alleged misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (citations and internal quotation marks omitted)); *Morris v. Kikendall*, No. 07-CV-2422, 2009 WL 1097922, at *15 (E.D.N.Y. Apr. 23, 2009) ("'[P]rosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute "egregious misconduct."'" (alteration in original) (quoting *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003))).

The Court notes, however, that Petitioner is unlikely to have succeeded, had he advanced such a claim. Indeed, the Appellate Division effectively addressed Petitioner's nondisclosure argument as a Due Process claim, and its reasoning is not an objectively unreasonable application of the governing constitutional standards:

> Contrary to the defendant's contention, the hearing court properly granted the People's motion for a protective order relieving it of the obligation to search approximately one year of recorded conversations taped by the Town of Newburgh Police Department (hereinafter the police department) for possible material under [*Rosario*] and [*Brady*]. The People's case consisted of testimony from a witness who agreed to act as an informant for the police. Numerous telephone conversations were made between this witness and the police, many of which were recorded by an automatic audio tape-recording system operated by the police department. The People were required to search for discoverable material for a two-month period, which represented the time leading up to the defendant's arrest, in addition to any and all conversations that could be identified through various records such as lead sheets and notes generated by the police during their investigation. It is uncontroverted that as a result of the People's efforts, thousands of documents and over 240 taped conversations were provided to the defendant.
>
> Contrary to the defendant's contention, the People were not required to search all tapes of every telephone call made to the police department and a protective order was properly issued since the effort to search all tapes would have been unduly burdensome and would have had an adverse impact on the legitimate needs of law enforcement. The tapes, which included close to 200,000 conversations, were identified only by date and time. To search all tapes for *Rosario* material . . . and possible *Brady* material . . . would have required an inordinate expenditure of time and resources. Under the circumstances, we find that good cause was shown and that the hearing court struck an appropriate balance. In any event, there was no reasonable possibility that the nondisclosure materially contributed to the verdict.

*Chrysler*, 787 N.Y.S.2d at 365–66. The Court can find nothing unreasonable about the Appellate Division's conclusion that, taken individually and collectively, the Department's conduct, the prosecutor's actions, and the trial court's protective order are not outrageous and do not offend conceptions of fundamental fairness, and the conclusion that Petitioner was not prejudiced by the trial court's protective order.

### 3.  Ineffective Assistance of Trial Counsel

Petitioner next asserts a claim based on his decision not to sever the trial. As discussed, in the context of the prosecution's intent to try Petitioner and Weygant jointly, Petitioner made a pre-trial motion to sever. (*See* Resp't's Mem. at 69.) But at a pre-trial hearing, Petitioner ultimately withdrew the motion, and he and Weygant were convicted after a joint trial. (*See id.*)

Petitioner now argues that his decision not to sever prejudiced him because it allowed the prosecution to use Weygant's grand-jury testimony, which was admissible against Weygant, to incriminate Petitioner.  (*See* Pet. ¶¶ 27, 30.)

Although Petitioner made a claim based on his failure to request severance in his direct appeal, this claim was not sufficient to exhaust the particular claim presented in the Petition.  In presenting multiple claims for ineffective assistance of trial counsel in his direct appeal, Petitioner generally argued that he "was severely prejudiced due to defense counsel's failure to accept severance" of the trial.  (Resp't's Ex. 33 at 475.)  The Appellate Division denied this claim on the merits.  (*See* Resp't's Ex. 40.)  Notably, however, the claim did not specifically refer to prejudice from Weygant's grand-jury testimony, but instead included language and cited state-court cases supporting the argument that trial counsel made a poor strategic choice because Weygant could have testified on Petitioner's behalf in a separate trial.  (*See* Resp't's Ex. 33 at 475 ("Had appellant been tried separately, co-defendant Weygant could have testified that appellant was not involved in the disappearance or murder of Pendino." (citing *People v. Vezza*, 453 N.Y.S.2d 216, 217 (App. Div. 1982) (finding lack of meaningful representation under New York law where trial counsel "failed to move for a severance . . . so that [the co-]defendant . . . could have testified at the trial of [the] defendant"))).)[19]  In the context of this presentation of the claim, this Court cannot say that Petitioner presented "all of the essential factual allegations" to the state court, and that the state court was thereby "alerted to consider, and [did] consider[], the

---

[19] Petitioner also cited a case where a New York court found lack of meaningful representation under New York law in part because trial counsel "failed to move for a severance to protect defendant from the prejudice of the admission [of] evidence . . . which would otherwise [have] be[en] inadmissible against [the defendant]."  *People v. Moore*, 477 N.Y.S.2d 68, 69 (App. Div. 1984).  However, he did not explain how that case specifically applied to his claim.

constitutional claim" that Petitioner suffered prejudice specifically from the introduction of Weygant's grand-jury testimony due to trial counsel's ineffectiveness in failing to request severance.  *See Daye*, 696 F.2d at 191, 194.

Petitioner did, however, exhaust this claim in his first collateral attack.  Specifically, in his § 440.10 Motion, Petitioner explicitly claimed that trial counsel's "failure to accept [the state court's] proffer of severance . . . . resulted in the admission of a mass of completely unnecessary incriminatory evidence in the form of the testimony of [Ferretti] and the Grand Jury testimony of [Weygant]." (Resp't's Ex. 42 at 703.)  He further supported this claim with detailed descriptions of the prejudice resulting from the use of Weygant's grand-jury testimony to incriminate him. (*See id.* at 708–11.)  It is true that the § 440.10 Motion blamed trial counsel's ineffectiveness on his failure to "accept" the severance, whereas the Petition blames trial counsel's ineffectiveness on his failure to "inform" Petitioner about the consequences of consenting to a joint trial such that "[P]etitioner could have made no knowing, voluntary and/or intelligent waiver of his right to severance." (Pet. ¶¶ 30–31.)  However, the Court finds that Petitioner exhausted this claim, because Petitioner made "all of the essential factual allegations" and raised "essentially the same legal doctrine" in the § 440.10 Motion.  *See Daye*, 696 F.2d at 191–92.

Finding the claim to be exhausted does not end the matter, however, because "[u]nder the independent and adequate state ground doctrine, a federal court sitting in habeas 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  "Independent and adequate state law grounds preventing federal review include violations of state procedural rules . . . ." *Id.*  Thus, "where a conviction rests upon [a

50

defendant's state law 'procedural default'], a federal habeas court normally cannot consider the defendant's federal constitutional claim." *Trevino v. Thaler*, 133 S. Ct. 1911, 1917 (2013); *see also Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) ("[A] state court procedural default will bar habeas review when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." (internal quotation marks omitted)). This is true "even where the state court has also ruled in the alternative on the merits of the federal claim." *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996) (internal quotation marks omitted); *see also Rosas v. Artus*, No. 05-CV-8440, 2013 WL 499610, at *5 (S.D.N.Y. Jan. 29, 2013) (explaining that "[w]here a state court explicitly imposes a state procedural bar and offers 'the last reasoned opinion on the claim,'" the claim is procedurally barred "'[e]ven where the . . . court has ruled on the merits of a federal claim "in the alternative"'" (quoting *Yist v. Nunnemaker*, 501 U.S. 797, 803 (1991)); *Murden v. Artuz*, 497 F.3d 178, 191 (2d Cir. 2007))); *Thomas v. Conway*, No. 08-CV-6263, 2010 WL 3420614, at *5 (W.D.N.Y. Aug. 26, 2010) ("[C]ollateral review of this claim is also barred because Petitioner previously raised this claim on direct appeal, and the Appellate Division rejected it on the merits. Although the claim is deemed exhausted, it is procedurally barred from habeas review by this Court." (citation omitted)); *McClarin v. Smith*, No. 05-CV-2478, 2007 WL 2323592, at *17 (E.D.N.Y. Aug. 10, 2007) (finding that petitioner's Due Process claim was "procedurally barred" because the state court had rejected it on the basis that the claim "had been adjudicated on the merits during petitioner's direct appeal").

Here, Justice Berry interpreted Petitioner's § 440.10 Motion to raise two claims—namely, that Petitioner "was denied the [e]ffective [a]ssistance of [c]ounsel because his attorney advised him against separate trials," (Resp't's Ex. 45 at 994), and that his "conviction

should be vacated because the [trial court] admitted into evidence . . . [g]rand [j]ury testimony of [Weygant] in violation of *Crawford*," (*id.* at 999).  Justice Berry denied the latter claim—which Petitioner notably has not brought in this Petition—on the ground that Petitioner "could have . . . raised [it] on direct appeal of the conviction."  (*Id.* (citing N.Y. Crim. Proc. Law § 440.10(3)(a)).)  But he denied the former claim—which is the predecessor to the claim under review—because that claim's "contentions were raised on the direct appeal of the conviction." (*Id.* at 994.)  In so ruling, Justice Berry relied on § 440.10(2)(a), which provides that a court

> must deny a motion to vacate a judgment when . . . [t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue.

N.Y. Crim. Proc. Law § 440.10(2)(a).  Petitioner's ineffective-assistance-of-trial-counsel claim is therefore precluded by Justice Berry's decision denying this claim on an independent-and-adequate state ground.  *See Cruz v. Berbary*, 456 F. Supp. 2d 410, 419–20 (W.D.N.Y. 2006) (finding that § 440.10(2)(a) is an independent and adequate state procedural ground and collecting cases); *Zanghi v. McGinnis*, No. 99-CV-6293, 2005 WL 3200279, at *6 (W.D.N.Y. Nov. 30, 2005) (classifying as "unreviewable" claims raised in a § 440.10 motion and denied pursuant to § 440.10(2)(a)); *D'Alessandro v. Fischer*, No. 01-CV-2551, 2005 WL 3159674, at *19 (S.D.N.Y. Nov. 28, 2005) ("[T]he trial court's express reliance on CPL § 440.10(2)(a) indicates that the court rejected Petitioner's ineffective assistance claim on an independent and adequate state procedural ground, precluding federal habeas review."); *Jones v. Miller*, No. 03-CV-6993, 2004 WL 1416589, at *10 (S.D.N.Y. June 25, 2004) (report and recommendation) (finding claim to be procedurally defaulted and noting that "federal habeas courts have recognized that a New York State court's reliance on [§ 440.10(2)(a)] constitutes an 'adequate'

state ground precluding federal habeas review"); *Heron v. Coughlin*, No. 94-CV-1860, 2003 WL 21921267, at *1 (S.D.N.Y. Aug. 11, 2003) (noting that "a dismissal pursuant to [§] 440.10(2)(a) would give rise to a procedural bar" to claims where a defendant "fails to assert the[] claims" on appeal such that "the claims should be found to be exhausted, but procedurally barred, because the claims [could] no longer be asserted in the state courts"), *adopted by* 2004 WL 2190917 (S.D.N.Y. Sept. 29, 2004). Moreover, while the Court thinks there is none, to the extent that there is any tension between Justice Berry's ruling that this claim was raised on direct appeal and this Court's ruling that it was not exhausted on direct appeal, Justice Berry's alternative holding denying the claim under § 440.10(3)(a) because it *could have* been raised on appeal, (*see* Resp't's Ex. 45 at 994), also serves as an independent-and-adequate state ground that procedurally bars this Court from reviewing that claim. *See Coons v. Superintendent*, No. 11-CV-1502, 2014 WL 316757, at *7 (N.D.N.Y. Jan. 28, 2014) ("[Section] 440.10(3)(a) . . . constitutes an independent and adequate state law ground."); *Witt v. Racette*, No. 10-CV-9180, 2012 WL 3205177, at *8 (S.D.N.Y. Aug. 7, 2012) ("Federal courts have recognized [§] 440.10(3)(a) as an adequate and independent procedural bar that precludes federal *habeas* review."); *Huggins v. Girdick*, No. 03-CV-3248, 2007 WL 433397, at *8 (E.D.N.Y. Feb. 7, 2007) (collecting cases); *Collins v. Superintendent Conway*, No. 04-CV-4672, 2006 WL 1114053, at *3 (S.D.N.Y. Apr. 26, 2006) (same); *Cameron v. New York*, No. 01-CV-9988, 2002 WL 31898076, at *7 (S.D.N.Y. Dec. 30, 2002) ("[Section] 440.10(3)(a) . . . constitutes an adequate and independent state ground that prevents a federal court from reviewing the merits of the claim.").

There are two exceptions to the independent-and-adequate-grounds doctrine, neither of which is availing here. First, a petitioner "may obtain federal review of a defaulted claim by

showing cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012).  However, Petitioner has not attempted to make such a showing. And in any event, such a showing would be entirely duplicative of his ineffective-assistance-of-appellate-counsel claim, which alleges that appellate counsel failed to present certain constitutional claims adequately on direct appeal, and which the Court independently reviews on the merits.  Second, in "extraordinary case[s]," a court may review a procedurally defaulted habeas claim in order to avoid a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see also Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (explaining that in "extremely rare" cases, "a petitioner may use his claim of actual innocence as a 'gateway,' or a means of excusing his procedural default, that enables him to obtain review of his constitutional challenges to his conviction").  However, this exception is expressly limited to situations where a petitioner presents a claim of innocence. *Schlup*, 513 U.S. at 321 (noting that this exception is "explicitly tied" to the petitioner's innocence).  Because Petitioner has not attempted to make a claim of actual innocence, the Court need not consider his substantive ineffective-assistance-of-trial-counsel claim to avoid a fundamental miscarriage of justice.  The Court thus rejects this claim.

### 4.  Ineffective Assistance of Appellate Counsel

Petitioner's final claim appears to be related to his ineffective-assistance-of-trial-counsel claim but is in fact quite different.  This claim, like the previous claim, stems from the prejudice Petitioner contends that he suffered from the use of Weygant's grand-jury testimony to incriminate him.  But where Petitioner argued in the previous claim that trial counsel's ineffective assistance caused him to consent to a joint trial wherein the prosecution used Weygant's grand-jury testimony against him, Petitioner argues in this claim that the actual use of

54

the testimony violated his Sixth Amendment right to confront the witnesses against him, and that

he consequently received ineffective assistance of counsel on direct appeal when his appellate

counsel failed to raise this issue in the direct appeal.

### a.  Procedural Background

Notably, this claim arises out of the same circumstances that led the Court to deny

Petitioner's ineffective-assistance-of-trial-counsel claim, although those circumstances deserve a

more detailed discussion in the context of this claim.  As discussed, the prosecution introduced

Ferretti's trial testimony containing Weygant's hearsay statements and Weygant's grand-jury

testimony at Petitioner's joint trial.  Because Weygant exercised his Fifth Amendment right not

to testify at the joint trial, Petitioner's trial counsel had no opportunity to cross-examine

Weygant about his statements to Ferretti or the Grand Jury.

On direct appeal, Habeas Counsel argued that the prosecution's use of Weygant's

hearsay statements from Ferretti's testimony to incriminate Petitioner violated his Confrontation

Clause rights, (*see* Resp't's Ex. 33 at 464 ("A defendant has a right under the Sixth Amendment

to confront the witnesses against him.  This right includes the right not to have the incriminating

hearsay statements of a non-testifying co-defendant admitted in evidence against him." (citing

*Bruton v. United States*, 391 U.S. 123 (1968)))), and that trial counsel was ineffective for failing

to object to these statements at trial, (*see id.* at 466 n.46 (arguing that Ferretti's hearsay

testimony "should have been objected to" and that trial counsel's "failure to do so prejudiced

[Petitioner]"); *id.* at 476 (arguing that trial counsel failed to make timely objections to Ferretti's

hearsay testimony so as to preserve the record)).  But Habeas Counsel limited his argument only

to "Ferretti's testimony of her conversations with . . . Weygant and alleged statements and

admissions [Weygant] made to her inculpating himself and [Petitioner]," which statements

55

Habeas Counsel argued "were inadmissible as against [Petitioner]." (*Id.* at 465.) Habeas Counsel also repeated this argument in his direct-appeal reply brief, again expressly limiting his argument to Ferretti's testimony. (*See id.* at 636 (characterizing Ferretti's hearsay testimony as a "*Bruton* violation" and noting trial counsel's "failure to properly preserve this issue").)

Habeas Counsel was subsequently suspended from legal practice in mid-2002, before the Appellate Division ruled on Petitioner's direct appeal. Thereafter, Petitioner retained Direct Appellate Counsel to pursue the appeal and the Appellate Division allowed Direct Appellate Counsel to file a supplemental brief. (*See* Resp't's Ex. 37.)[20]

Before the filing deadline expired, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), wherein it expanded its interpretation of the Confrontation Clause in *Ohio v. Roberts*, 448 U.S. 56 (1980), to bar admission of "testimonial evidence" without "unavailability and a prior opportunity for cross-examination," regardless of whether the evidence bore sufficient "indicia of reliability." *Crawford*, 541 U.S. at 68. In adopting this standard, the Supreme Court declined to provide a "comprehensive definition of 'testimonial,'" but it did note that the term "applies at a minimum to prior testimony . . . before a grand jury." *Id.* Because the Supreme Court decided *Crawford* while Petitioner's case was pending on direct appeal, New York appellate courts would have applied the newly adopted standard to Petitioner's appeal. *See, e.g.*, *People v. Hardy*, 824 N.E.2d 953, 957 (N.Y. 2005) ("Because this appeal was not yet final at the time the Supreme Court decided *Crawford*, defendant is entitled to invoke *Crawford*, and we are compelled to apply it."); *People v. Pacer*, 796 N.Y.S.2d 787, 788 (App. Div. 2005)

---

[20] Before Petitioner retained Direct Appellate Counsel, the Appellate Division appointed Bruce Townsend to represent Petitioner on direct appeal. (*See* Resp't's Ex. 36.) It then replaced Townsend with Direct Appellate Counsel in an order dated February 19, 2004. (*See* Resp't's Ex. 37.)

("Although [*Crawford*] had not yet been decided when this case was tried, it sets forth 'a new rule for the conduct of criminal prosecutions' and thus must be applied retroactively to this case, which was 'pending on direct review.'" (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987))).

When Direct Appellate Counsel filed the supplemental brief approximately two months after *Crawford*, it did not raise the Confrontation Clause issue with respect to the use of Weygant's grand-jury testimony against Petitioner. Instead, it re-alleged many of the claims made in Habeas Counsel's direct-appellate briefs and added a new claim challenging the chain of custody for a piece of evidence.[21] (*See* Resp't's Ex. 38.) Thus, when the Appellate Division ultimately denied the direct appeal on the merits, it considered the narrow Confrontation Clause claim and related ineffective-assistance-of-trial-counsel claim raised in Habeas Counsel's direct-appellate briefs, but it did not consider any *Crawford* claims related to the use of Weygant's grand-jury testimony. (*See* Resp't's Ex. 40 at 682 (Appellate Division's Decision & Order denying Petitioner's "remaining contentions" as "without merit").)

Petitioner first raised the specific Confrontation Clause claim at issue in his § 440.10 Motion, filed by Direct Appellate Counsel a few months after the Court of Appeals denied leave to appeal the Appellate Division's denial of Petitioner's direct appeal. (*See* Resp't's Ex. 42 (§ 440.10 Motion, filed May 3, 2005); Resp't's Ex. 41 (Court of Appeals' denial of leave to appeal, entered Feb. 18, 2005).) In that motion, Direct Appellate Counsel raised two issues: first, the aforementioned claim that trial counsel was ineffective for consenting to the joint trial

---

[21] Although the supplemental brief re-alleged the claim that trial counsel was ineffective for "reject[ing] the trial court's proffer of a severance," (*see* Resp't's Ex. 38 at 658), it did not re-allege the Confrontation Clause claim related to the use of Ferretti's hearsay testimony against Petitioner.

under the newly alleged theory that Weygant's grand-jury testimony prejudiced Petitioner, and, second, the new claim that the introduction and use of Weygant's grand-jury testimony violated Petitioner's Confrontation Clause rights under *Crawford*. (*See* Resp't's Ex. 42.) The state court denied both claims on procedural grounds, specifically noting that Petitioner "could have . . . raised the [second claim] on direct appeal of the conviction" because "*Crawford*[] was decided . . . during the pendency of [Petitioner's] direct appeal." (Resp't's Ex. 45 at 999 & n.3 (citing N.Y. Crim. Proc. Law § 440.10(3)(a)).)

At some point, Habeas Counsel's suspension ended and he replaced Direct Appellate Counsel as Petitioner's appellate counsel. Thereafter, Habeas Counsel filed a Coram Nobis Petition, arguing that Direct Appellate Counsel's failure to raise the Confrontation Clause argument in the direct-appellate supplemental brief constituted ineffective assistance of appellate counsel. (*See* Resp't's Ex. 47.) The Appellate Division denied the Coram Nobis petition on the merits, holding that Petitioner had "failed to establish that he was denied the effective assistance of appellate counsel" under both federal and state law. (Resp't's Ex. 50 (citing *Jones v. Barnes*, 463 U.S. 745, 754 & n.7 (1983) (finding no "constitutional right to have appellate counsel raise every nonfrivolous issue that [a] defendant requests")).) Petitioner's ineffective-assistance-of-appellate-counsel argument is therefore exhausted for purposes of habeas review. *See Aparicio v. Artuz*, 269 F.3d 78, 92 (2d Cir. 2001) (finding claim raised in coram nobis petition exhausted where "Appellate Division denied [the] . . . application"); *Gomez v. Brown*, 655 F. Supp. 2d 332, 347 n.5 (S.D.N.Y. 2009) (finding claim to be exhausted where it was "raised . . . in [a] writ of error coram nobis[] and the Appellate Division summarily denied the application").

b.  Substantive Review

The Court is presented with the question whether the Appellate Division's denial of the Coram Nobis Petition was an unreasonable application of the law defining the federal constitutional right to effective assistance of appellate counsel.  *See Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) ("[T]he Appellate Division cited *Jones* [*v. Barnes*] in its summary disposition denying [petitioner's] *coram nobis* petition, and accordingly invoked the correct legal principle at issue.  This places our review of the . . . habeas petition squarely within the 'unreasonable application' prong of § 2254(d)(1).").  "[T]he proper standard for evaluating" such a claim "is that enunciated in *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see also Aparicio*, 269 F.3d at 95 ("Although it was born in the context of ineffective assistance of trial counsel, *Strickland*'s two-prong test applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right."); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) ("Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel.").  In other words, Petitioner "must first show that his counsel was objectively unreasonable" in failing to raise the issue on appeal, and then "must show a reasonable probability that, but for his counsel's unreasonable failure [to raise the issue], he would have prevailed on his appeal."  *Smith*, 528 U.S. at 285–86.

Under the first prong, "it is difficult to demonstrate that counsel was incompetent" for "fail[ing] to raise a particular claim" because "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Smith*, 528 U.S. at 288; *see also Jones*, 463 U.S. at 754 (recognizing that appellate counsel is under no "duty to raise every 'colorable' claim suggested

59

by a client"); *Aparicio*, 269 F.3d at 95 ("Counsel is not obliged to advance every nonfrivolous

argument that could be made."); *Mayo*, 13 F.3d at 533 ("In attempting to demonstrate that

appellate counsel's failure to raise a state claim constitutes deficient performance, it is not

sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument,

for counsel does not have a duty to advance every nonfrivolous argument that could be made.").

"However, a petitioner may establish constitutionally inadequate performance if he shows that

counsel omitted significant and obvious issues while pursuing issues that were clearly and

significantly weaker." *Mayo*, 12 F.3d at 533 (citation omitted); *see also Jackson v. Leonardo*,

162 F.3d 81, 85 (2d Cir. 1998) (finding deficient performance where appellate counsel "fail[ed]

to raise a well-established, straightforward, and obvious . . . claim"); *Claudio v. Scully*, 982 F.2d

798, 805 (2d Cir. 1992) (noting that a court may find deficient performance where "[n]o

reasonably competent attorney [w]ould have missed the . . . claim" and appellate counsel's

"decision not to raise the claim cannot be viewed reasonably as a strategic decision.")

　　　Under the second prong, which requires a petitioner "[t]o establish prejudice in the

appellate context, a petitioner must demonstrate that there was a reasonable probability that his

claim would have been successful before the state's highest court." *Mayo*, 13 F.3d at 534

(internal quotation marks and alterations omitted); *see also Clark*, 214 F.3d at 321 (holding that

a petitioner "must show . . . that the outcome of his appeal would have been different had

counsel raised the issue"); *Abdurrahman v. Henderson*, 897 F.2d 71, 74 (2d Cir. 1990) (denying

ineffective-assistance-of-appellate-counsel claim where petitioner "fail[ed] to demonstrate any

reasonable probability that the outcome of his appeal would have been different"); *cf. Bunkley v.*

*Meachum*, 68 F.3d 1518, 1522–23 (2d Cir. 1995) (when analyzing an ineffective-assistance-of-

appellate-counsel claim based on omission of a federal claim in an appeal, "looking to the

probable outcome of the direct appeal in state court will be adequate under federal constitutional law doctrine to preserve confidence in the outcome and protect the defendant from prejudice"). "A reasonable probability is one sufficient to undermine confidence in the outcome of the . . . appeal." *Aparicio*, 269 F.3d at 95.

Moreover, in the context of AEDPA, Petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance . . . . Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002). Seeking habeas relief under *Strickland* is thus "all the more difficult," because "[t]he standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citations and internal quotation marks omitted); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (noting the "doubly deferential judicial review that applies to a *Strickland* claim evaluated under the [AEDPA] standard"). Thus, "[w]hen [AEDPA] applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788; *see also Gueits v. Kirkpatrick*, 612 F.3d 118, 125 (2d Cir. 2010) ("[O]ur review is not focused on the proper application of New York law. Our task is limited to assessing whether the Appellate Division unreasonably applied *Strickland* . . . , even assuming that the state courts erroneously applied state law.").

Applying this framework, the Court finds that the Petition fails to prove either objectively unreasonable performance or the likelihood of a different outcome on the appeal because Petitioner's trial counsel failed to object to the admission or use of Weygant's grand-jury testimony at trial. Under New York law, a criminal defendant may not argue a legal issue

61

on appeal unless his trial counsel preserved the issue by raising an objection at trial.  *See* N.Y.

Crim. Proc. Law § 470.05(2) ("For purposes of appeal, a question of law with respect to a ruling

or instruction of a criminal court during a trial or proceeding is presented when a protest thereto

was registered, by the party claiming error, at the time of such ruling or instruction or at any

subsequent time when the court had an opportunity of effectively changing the same."); *People*

*v. Kelly*, 832 N.E.2d 1179, 1181 (N.Y. 2005) ("Ordinarily, preservation is essential to the

exercise of [the Court of Appeals'] jurisdiction, which is limited to the review of questions of

law." (citations omitted)).  Where, as here, a defendant specifically seeks appellate review of the

admission or use of evidence that arguably violated his Confrontation Clause rights, his trial

counsel's failure to object to the evidence at trial constitutes a failure to preserve the issue for

appeal and thus acts as a waiver of the right to appeal that issue.  *See People v. Thomas*, 949

N.Y.S.2d 545, 547 (App. Div. 2012) ("Defendant failed to preserve for our review his contention

that his constitutional right of confrontation was violated inasmuch as he failed to object to the

questioning implicating that right during the prosecutor's cross-examination of him . . . ."); 

*People v. Dombroff*, 843 N.Y.S.2d 421, 423 (App. Div. 2007) ("[S]ince the defendant did not

specifically argue that the complained-of testimony and documentary evidence deprived him of

his right to confrontation, that argument is unpreserved for appellate review."); *People v.*

*Mitchell*, 826 N.Y.S.2d 144, 145 (App. Div. 2006) ("Since no objection was raised to the

admissibility of the tape at trial, the defendant's contention is unpreserved for appellate review."

(citations omitted)).  Moreover, a reasonably competent attorney would have known in

2004—when Direct Appellate Counsel filed their brief—that a state appellate court would likely

have declined to resolve an unpreserved Confrontation Clause claim.  *See People v. Serrano*, 684

N.Y.S.2d 1, 2 (App. Div. 1998) ("[B]y failing to . . . object when the nontestifying codefendant's

. . . statement . . . [was] read into evidence, defendant expressly waived and failed to preserve for appellate review his claim that the court violated his right of confrontation by admitting that evidence at trial . . . ."); *People v. Pacheco*, 595 N.Y.S.2d 453, 454 (App. Div. 1993) ("Defendant failed to object to the summation comments of the prosecutor that he now claims were improper and prejudicial, and thus failed to preserve his claims for appellate review as a matter of law."). Petitioner thus cannot demonstrate that Direct Appellate Counsel was objectively unreasonable in failing to raise this issue, or that the outcome of the appeal would have been different had the issue been raised. *Cf. Aparicio*, 269 F.3d at 96 ("[Petitioner] did not raise his double jeopardy argument at his trial . . . .  Therefore, any efforts by Petitioner's appellate counsel to make this argument would have been futile because the argument had already been waived by trial counsel's failure to raise an objection."); *Whitfield v. Ricks*, No. 01-CV-11398, 2006 WL 3030883, at *12 (S.D.N.Y. Oct. 24, 2006) ("Because the issues were clearly unpreserved for review, appellate counsel cannot be said to have been ineffective for failing to raise them on appeal." (internal quotation marks and alterations omitted)).  And, in the context of AEPDA review, the Court certainly cannot say that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 131 S. Ct. at 786–87.

        The Court construes Petitioner's submissions to raise two counterarguments.  First, in a letter to the New York Court of Appeals seeking leave to appeal the Appellate Division's denial of the Coram Nobis Petition—but not in the Habeas Petition or Reply—Habeas Counsel argued that trial counsel did object twice to the prosecution's use of Weygant's grand-jury testimony in its summation.  (*See* Resp't's Ex. 51 at 1558.)  However, to preserve a Confrontation Clause

challenge on appeal to a New York court, trial counsel had to object specifically on Confrontation Clause grounds. *See People v. Mack*, 787 N.Y.S.2d 397, 398 (App. Div. 2005) ("Although the defendant objected to that testimony . . . , he did not specify the [Confrontation Clause] ground now raised on appeal . . . . Therefore, the issue is unpreserved for appellate review." (citations omitted)); *People v. Perez*, 779 N.Y.S.2d 584, 585 (App. Div. 2004) ("Although the defendant objected to the testimony at issue, he did not specify the ground now raised on appeal. Therefore, the issue of whether he was deprived of his right of confrontation is unpreserved for appellate review." (citations omitted)). And as the Court explained in its overview of the Petition's procedural history, trial counsel objected to Weygant's grand-jury testimony only on the ground that the prosecution's description of that testimony in the summation was misleading. Nowhere in the objections did trial counsel mention the Confrontation Clause. In fact, the trial court both times granted trial counsel's requested relief when it struck the prosecution's statements from the record and issued curative instructions to the jury. (*See* Tr. 3369, 3399–400.) The Court thus finds that the issue would have been considered unpreserved despite the objections.

Second, in his Reply Memorandum, Habeas Counsel argues, essentially, that preservation would have been unnecessary where the appellate court would have applied "a new constitutional principle of significance and retroactive effect" because "[a]ny other regime would leave no recourse for state prisoners held in violation of the [C]onstitution." (Reply Mem. at 22.) This argument might be appealing in a case where the Supreme Court unpredictably announced an entirely new constitutional right with retroactive effect that no trial counsel could have been expected to foresee in considering whether to raise an objection at trial. However, in the specific context of *Crawford*, New York courts have applied the preservation requirement to

deny a direct appeal where a defendant was convicted before the Supreme Court decided *Crawford*, attempted to assert rights under *Crawford* on appeal, but did not assert those rights at trial.  *See, e.g.*, *People v. Bones*, 793 N.Y.S.2d 545, 546 (App. Div. 2005) (rejecting *Crawford* claim on direct review of pre-*Crawford* conviction because, "having failed to object with any specificity that the admission of [evidence] violated his Sixth Amendment right to confront witnesses against him [as that right was interpreted in *Crawford*], the defendant failed to preserve this issue for appellate review" (citations omitted)); *cf. People v. Hardy*, 824 N.E.2d 953, 957 & n.3 (N.Y. 2005) (applying *Crawford* to a not-yet-final appeal because "the record ma[de] clear that defense counsel made a timely and specific objection [based on the Confrontation Clause] to the People's use of [testimonial evidence]," which objection "preserved the issue for [appellate] review").  Moreover, Petitioner's trial counsel were undoubtedly aware of their ability to object at trial, as they raised the Confrontation Clause issue in a pre-trial (and thus pre-*Crawford*) motion to sever the trials.  (*See* Resp't's Ex. 14 at 150 ("In light of the announced intention of the People [to admit Weygant's grand-jury testimony into evidence], [Petitioner] is entitled to confront [h]is co-defendant concerning the statements allegedly made to [Ferretti].").)  Habeas Counsel also raised a Confrontation Clause argument in the direct-appellate brief he prepared before he was suspended, and thus before *Crawford* was decided. (*See* Resp't's Ex. 33 at 464 ("A defendant has a right under the Sixth Amendment to confront the witnesses against him.  This right includes the right not to have the incriminating hearsay statements of a non-testifying co-defendant admitted in evidence against him.").)  However, he raised it only in the context of the alleged prejudice resulting from Ferretti's testimony, and thus he failed to present the Petition's specific claim that Petitioner suffered prejudice from the admission of Weygant's grand-jury testimony.  (*See id.* at 463–64 (arguing that "[t]he People's

65

case . . . was built around Ferretti's testimony that Weygant made out-of-court statements to her which were either directly incriminating or suggestive of [Petitioner's] culpability," but that "[n]one of this testimony was fairly admissible against [Petitioner]" and "his trial counsel objected to almost none of it").)  Thus, in finding that the state appellate courts would have rejected Petitioner's argument as unpreserved if appellate counsel had raised it, the Court also rejects Petitioner's argument that denying the Petition for failure to comply with New York's preservation requirement would "leave [him] no recourse."

In light of the foregoing analysis denying Petitioner's specific claim that he was denied the right to effective assistance of appellate counsel for failing to raise a substantive Confrontation Clause claim under *Crawford* on direct appeal, one might wonder why Petitioner did not raise the related claim that he was denied the right to effective assistance of appellate counsel for failing to raise the claim that trial counsel was ineffective for failing to preserve the Confrontation Clause issue for appeal.  Indeed, as discussed, Habeas Counsel made that exact claim in his direct-appellate brief as it specifically applied to the prosecution's use of Ferretti's hearsay testimony.  (*See* Resp't's Ex. 33 at 476 (arguing generally that trial counsel was ineffective for "failure to make timely objections and preserve the record" and specifically noting that "[d]efense counsel[] . . . failed to make timely objection to the hearsay testimony offered against Chrysler by Ferretti" (some alterations omitted)).)  However, Habeas Counsel and Direct Appellate Counsel failed to exhaust the ineffective-assistance-of-trial-counsel claim as it applied to Weygant's grand-jury testimony in either the direct appeal or in the § 440.10 Motion.  And, for some reason, Habeas Counsel failed to exhaust the ineffective-assistance-of-appellate-counsel version of that claim in the Coram Nobis Petition.  It is thus unsurprising that Habeas Counsel failed to raise the unexhausted claim in the Petition.  Accordingly, the Court

66

cannot discern a method whereby it can evaluate Petitioner's Confrontation Clause claim, and its holding that the ineffective-assistance-of-appellate-counsel claim raised in the Petition would have been unsuccessful had it been raised dictates its broader holding denying the Petition. *Cf. Aparicio*, 269 F.3d at 96 n.9 ("Crucially, [petitioner's] amended *coram nobis* petition did not claim that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel, nor did it raise the trial counsel issue directly.  Unless these claims were exhausted, the district court would not have jurisdiction to grant a habeas petition." (citation omitted)).

### C.  Certificate of Appealability

Under AEDPA, "an appeal may not be taken to the court of appeals" "[u]nless a circuit justice or judge issues a certificate of appealability [("COA")]."  28 U.S.C. § 2253(c)(1).  A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).  Where, as here, a district court rejects a petition on the merits, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  A district court may issue a COA "even though every jurist of reason might agree . . . that petitioner will not prevail" on appeal.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

Although the Court is confident in the correctness of its ruling, it also finds that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner" with regard to the Confrontation Clause issue.  *Id.* at 336 (internal quotation marks omitted).  And it finds, relatedly, that "the [Confrontation Clause] issues presented [are] adequate to deserve encouragement to proceed further."  *Id.* (internal quotation marks omitted).  The Court thus grants a COA on the specific issue of whether Petitioner's right to the effective assistance of appellate counsel was violated when that counsel did not raise his Confrontation

Clause claim on appeal in a way that would have allowed the Court to decide whether Petitioner's Confrontation Clause rights were violated. *See Blackman v. Ercole*, 661 F.3d 161, 163–64 (2d Cir. 2011) ("In granting a COA, a district judge is required to indicate the 'specific issue or issues' that satisfy [the § 2253(c)(3) standard] . . . ." (quoting 28 U.S.C. § 2253(c)(3))).

### III.  Conclusion

For the reasons stated herein, the Court finds that the Petition is timely.  However, it also finds, on the merits, that Petitioner's claims do not warrant habeas relief.  Accordingly, it is

ORDERED that the Report and Recommendation dated April 18, 2010, is ADOPTED to the extent it recommends dismissal of the Petition.  It is further

ORDERED that Petitioner's writ of habeas corpus is DISMISSED with prejudice.  It is further

ORDERED that a Certificate of Appealability shall be issued, and that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this judgment on the merits would be taken in good faith.

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close this case.

SO ORDERED.

Dated:     March 31, 2014
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

68